*Decisions will be entered under Rule 50.*

GOEBEL BREWING COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 93336. Filed October 7, 1964.

*John Westbrook Fager* and *Edward R. Sandell*, for the petitioner.
*Robert W. Siegel*, for the respondent.

FISHER, *Judge:* This proceeding is for the redetermination of a deficiency in petitioner's income tax for 1954 in the amount of $183,-503.13. The deficiency results from respondent's disallowance of a portion of a net operating loss carryback from the year 1956. Most of the facts have been stipulated. The basic issue is whether or not the sum of $500,000 (out of a total of $600,000 of minimum royalties) was accruable in 1956.

FINDINGS OF FACT

The stipulated facts are found accordingly.

Petitioner is a Michigan corporation engaged in the brewery business with its principal office located in Detroit, Mich. Its return for the taxable year involved was filed with the district director of internal revenue at Detroit. The return was for a calendar year and was made on an accrual basis.

In September 1954, petitioner, with a wholly owned subsidiary, Goebel Brewing Co. of California, contracted with Arthur Guinness Son & Co., Ltd., a British corporation, and an associated company, Guinness Son & Co. Distributors, Ltd., a New York corporation, for the exclusive right to manufacture and sell Guinness beer and ale for a period of 20 years in the United States and the then Territories of Hawaii and Alaska.

The contract called for the payment by petitioner to Guinness of royalties as follows:

2. * * *

(b) The royalty will be a royalty on the "net sales" of Guinness Beer sold by Goebel after October 1, 1954, of Three Dollars and Twenty-Five Cents ($3.25) New York Funds per barrel (thirty-one (31) gallons United States Liquid Measure) provided, however, that Goebel shall in any event pay to Guinness and Distributors in the aggregate a minimum royalty for the twelve (12) months' period ending December 31 in the years 1955, 1956 and 1957 of $100,000, $150,000, and $250,000, respectively, and in each subsequent twelve (12) months' period ending December 31, until and inclusive of 1960, $250,000, and in each subsequent twelve (12) months' period ending after December 31, 1960, $450,000 * * *.

The contract provided that it might be canceled upon 3 months' notice as follows:

21. * * *

(c) This Agreement may be terminated upon three (3) months' written notice (or by written notice of such lesser period as the party to whom the notice is addressed may be willing to accept):

\*     \*     \*     \*     \*     \*     \*

(3) by Goebel prior to December 31, in any year after 1957 if at any time after December 31, 1957 Goebel shall decide to stop brewing Guinness Beer.

(d) The termination of this Agreement as hereinabove provided shall not thereby discharge Goebel from any liability to Guinness and/or Distributors for any royalties due at the date of such termination or the date of any notice effecting such termination.

\*      \*      \*      \*      \*      \*      \*

23. It is agreed that none of the parties hereto shall be liable to any other party hereto for damages of any kind on account of termination of this Agreement with or without notice as provided herein (other than royalties due as hereinabove provided and damages caused by breaches of this Agreement), whether damages result from loss through commitments or obligations or leases, from loss of investment or of present or prospective profits, or from inability to meet obligations, or from any other cause.

Prior to 1956, the petitioner succeeded to the rights of its subsidiary in the Guinness contract and the Morco Corp. succeeded to the rights of Arthur Guinness & Co. Distributors, Ltd. Both of the last two named corporations will be referred to hereinafter as Guinness.

Guinness furnished petitioner the necessary formulas and sent technicians to the United States to supervise the production of Guinness beer and ale by petitioner.

Petitioner's sales of Guinness beer failed to reach the volume expected and in April 1956, at petitioner's request, Guinness agreed to a reduction in petitioner's selling price of Guinness beer to meet competitive prices in the United States; a reduction of the royalties payable on petitioner's sales of 50 cents per barrel; and a further reduction of the minimum royalties to $600,000, in the aggregate, payable $100,000 on or before March 31, 1957, and $125,000 on or before March 31 of each succeeding year through 1961. The original agreement of September 1954 was so amended, effective April 1, 1956.

The amendment to the agreement also extended the date after which petitioner might terminate the contract and relieve itself of its obligations thereunder from December 31, 1958, to December 31, 1960, and specifically provided that such termination by petitioner would not affect its obligation to pay the minimum royalties specified under the amended agreement.

In the years 1955 and 1956 combined, petitioner had net sales from Guinness beer of $260,857, on which it sustained an operating loss of $33,102.

By letter dated December 20, 1956, Guinness agreed to a postponement of payment of $50,000 of the minimum royalties of $100,000 due from petitioner March 31, 1957, to September 30, 1957.

At a special meeting of petitioner's board of directors held December 28, 1956, it was decided that operations under the Guinness contract would never be successful and should be terminated forthwith. Accordingly, a resolution was adopted canceling the Guinness contract as of December 31, 1956, and Guinness was so notified by the following cablegram:

Because of substantial operating losses incident to Guinness operation, the Directors of Goebel have this day ordered irrevocable termination of contract of October 1, 1954, as amended April 25, 1956, effective December 31, 1956. Explanatory letter follows. Regards.

Petitioner had given no previous notice to Guinness of its intention to cancel the contract.

In deciding to terminate the Guinness contract, petitioner had been advised by counsel of the tax benefits to be obtained from the deduction of the minimum royalties in that year (1956) and the carryback of such loss to the prior year 1954.

The explanatory letter written by petitioner's president and general manager, dated December 31, 1956, was in material part as follows:

The action taken by our Board at a special Board of Directors Meeting held on December 28, 1956, came as a result of a complete reconsideration of our Guinness problem.

When Arthur Hughes and your good self visited us in Detroit in early December, we very honestly and frankly felt that we would continue with the production and sale of Guinness for another year. However, it was the consensus of opinion of our Board that we should terminate the sale of Guinness as of December 31, 1956, and consequently, the cable went forward to you on the 28th.

I am terribly sorry that our Guinness Licensing Agreement has not worked out to our mutual satisfaction.

We shall, in all probability, visit you in London within the next three or four months, and we shall look forward to seeing you at that time.

In reply to the telegram and followup letter, Sir Hugh Beaver, on behalf of Guinness, wrote petitioner under date of January 16, 1957, as follows:

My Dear Andy:

I am formally acknowledging your cable of Friday, 28th December, and your following letter of the 31st December. As you will understand, the news did not come altogether as a surprise to us.

My Board realises the situation under which your decision was taken; and although according to our existing agreement your Company is required to give three months' notice, we are prepared, as is permitted in the agreement, to waive the three months given us. We have ascertained that our partners in this matter, Morco, are prepared to agree likewise.

Therefore, as we now see it, the situation is left that all sales of Guinness Beer and Ale have come to an end from the 31st. December last and no use will be made of our name or trade mark or of any material bearing the hereafter.

With regard to the financial position, the payments will according to the revised agreement of 1956 be as follows:

On 31st March 1957_____ $100, 000
On each 31st March in the years 1958–1961 inclusive_____ $125, 000

Arthur Hughes would like to join with me in expressing our great personal regret that this joint venture was not able to proceed to success; we cannot help feeling regret that special circumstances have militated against success.

With all best wishes,

(Signed)   Hugh Beaver.

Petitioner did not make the $50,000 payment due Guinness on March 31, 1957.

On April 11, 1957, petitioner's president wrote Guinness as follows:

Our counsel, who will be in France from about the 1st of May, will be available to meet with us in London, and it is my desire to discuss alternate possibilities for discharge of the liability arising from the minimum royalty undertaking by Goebel as initially fixed in the contract of October 1, 1954, and as subsequently amended.

Our counsel feels that there are possible defenses to the claim for the minimum royalty, and my Board has instructed me to explore with you the possibility of compromising the asserted liability. The possibilities encompass the following:

1. Payment of a lesser sum than asserted, payment to be made on dates other than as presently contemplated.
2. The assignment of the contract to another United States brewery acceptable to Guinness.
3. Forbearance from enforcement of the obligation in consideration of certain benefits which Goebel could make available to Guinness.

I feel, as does my Board, that a full discussion of these possibilities may result in a solution to the very serious problem which confronts Goebel, and that every effort should be made by ourselves to adjust the matter before any firm position is taken based upon the advice of our counsel.

It seems to me that the situation is such that an open and candid discussion from a practical point of view could produce a solution to the problem. It is for these reasons that I desire an opportunity to meet with you.

On May 9, 1957, petitioner's treasurer wrote the following letter to its president then in London:

Per our conversation, I am enclosing a certified check payable to them for $200,000. I hope that with this as leverage, and the arguments you can put forth about the losses we have already sustained and the additional outright loss which will be incurred to us in any royalty payment, they will be willing to see a settlement from a reasonable point of view.

Of course, we do not know for sure, but an immediate cash settlement might be advantageous to them from a tax standpoint in the United States in view of the limitation of a five-year carry-forward on losses.

On November 15, 1957, an agreement was reached by petitioner and Guinness which provided that in satisfaction of all claims of Guinness against petitioner under the contract of October 1, 1954, as amended, petitioner would pay to Guinness the total amount of $275,000, of which $100,000 would be paid in cash and the balance by petitioner's promissory note due on or before February 15, 1958. The settlement agreement referred to provided in part as follows:

1. In consideration of the payment by Goebel to Guinness and to Morco of the sum of Two Hundred and Seventy-Five Thousand ($275,000) Dollars in United States currency payable in New York City, New York, receipt of One Hundred Thousand ($100,000) Dollars of which is hereby acknowledged by Guinness and by Morco, and the balance of which Goebel promises and agrees to pay to Guinness and to Morco on or before February 15, 1958, which said obligation is evidenced by a certain corporate promissory note, of even date herewith, a facsimile of which is annexed hereto and made a part hereof, and other good and valuable considerations, Guinness and Morco do hereby jointly and severally

release Goebel of and from any and all obligations and liabilities under or arising by virtue of said Agreement of October 1, 1954 and any and all amendments, supplements and modifications thereof, either verbal or in writing, and any and all claims and demands thereunder of any kind and character whatsoever of Guinness or of Morco against Goebel.

2. In consideration of the release by Guinness and by Morco, as in the last above paragraph provided, and other good and valuable considerations, the receipt of which is hereby acknowledged by Goebel, Goebel does hereby release both Guinness and Morco of and from any and all obligations and liabilities under or arising by virtue of said Agreement of October 1, 1954 and any and all amendments, supplements and modifications thereof, either verbal or in writing, and any and all claims or demands thereunder of any kind or character whatsoever that Goebel may have against either Guinness or Morco.

3. In consideration of the payment made and to be made by Goebel to Guinness and to Morco and the mutual releases of the parties hereto, as in paragraphs 1 and 2 hereof provided, said Agreement of October 1, 1954 and any and all amendments, supplements, and modifications thereof, either verbal or in writing, are hereby cancelled, and any and all claims, demands, obligations or liabilities thereunder of any kind and character whatsoever that Goebel, Guinness or Morco have, or may have, are hereby discharged.

In its return for 1956, petitioner claimed a loss deduction from cancellation of the Guinness contract of $834,635.13, computed as follows:

| | |
|---|---:|
| Minimum royalties | $600,000.00 |
| Unamortized research and development expenses | 162,082.20 |
| Packaging material bearing the Guinness trademark | 54,836.71 |
| Advertising material imprinted with the Guinness name | 9,762.42 |
| Guinness beer in vats, bottles, or cans poured down the sewer | 12,805.80 |
| Total | 839,487.13 |
| Less: Royalty charged to cost of sales at rate of 50 cents per barrel | 4,852.00 |
| Grand total | 834,635.13 |

In determining the amount of the carryback loss from 1956 to 1954, respondent disallowed $500,000 of the minimum royalties claimed as a deduction in 1956.

OPINION

The sole question in issue here is whether and to what extent, in excess of $100,000, the $600,000 deduction claimed by petitioner in its 1956 return and used as a carryback loss to 1954 was accruable in 1956. Respondent has determined that only $100,000 of the $600,000 claimed is deductible as an accrual in 1956. Respondent's contention is that the amount of petitioner's liability arising from its cancellation of the Guinness contract, in excess of $100,000, was not fixed and determined in 1956. The $100,000 allowed by respondent represents the amount of minimum royalties which had accrued during the period of petitioner's operations under the Guinness contract up to December 31, 1956.

Petitioner's contention seems to be that the full amount of the minimum royalties for 1956 and future years became due and payable at

the time of and by reason of its unilateral cancellation of the contract. Respondent's position is that petitioner's liability for its breach of the contract including whatever allowance was to be made for the minimum royalties, became fixed and certain in 1957 when the parties agreed to petitioner's payment to Guinness of $275,000 in settlement of all of its liabilities under the contract. Respondent submits that the petitioner has undertaken to obtain the deduction in 1956 because that is the last year from which a net operating loss can be carried back to 1954. We agree with respondent in this respect because we think this inference is clear from the entire record and petitioner, bearing the burden of proof, has not satisfied us to the contrary.

Under all of the circumstances, we agree with respondent's contention that of the $600,000 item, $500,000 was not an accruable liability of 1956. Petitioner is in error, we think, in assuming that its termination of the contract in 1956 rendered it immediately liable for the minimum royalties to be paid under the contract. There is no such provision in the contract itself. It provided that the royalties were to be paid "on the net sales of Guinness beer sold by Goebel." The minimum royalties feature of the contract merely sets the definite minimum amount of royalties ultimately to be paid (but not then due or certain) regardless of the amount of petitioner's sales of Guinness beer.

It is to be noted that neither in its cablegram nor its more detailed letter informing Guinness of the termination of the contract did petitioner admit its liability for the payment of the $600,000 of the minimum royalties, or for any other specified amount. By letter to Guinness dated January 28, 1957, petitioner's president proposed "To discuss with you and your associates how the matter can be best resolved." In the final settlement agreement of November 15, 1957, no specific mention was made of minimum royalties. Petitioner's payment of $275,000 was said to be for the release of petitioner "from any and all obligations and liabilities under or arising by virtue of said agreement of October 1, 1954, and any and all amendments, supplements and modifications thereof, either verbal or in writing, and any and all claims and demands thereunder of any kind and character whatsoever of Guinness or of Morco against Goebel."

What considerations other than Guinness' loss of royalties may have entered into the settlement agreement, we have no way of knowing. The correspondence between petitioner and Guinness, both before and after petitioner's termination of the contract, and the testimony of petitioner's president, make it highly speculative as to whether petitioner deemed itself liable for the full amount of $600,000 of minimum royalties in 1956 when the contract was terminated. Such facts and circumstances do not satisfy petitioner's burden of proving the deductibility of the amount as an accruable liability of 1956.

A liability is accruable by a taxpayer reporting on an accrual basis only when all events have occurred which fix the amount of the liability and determine the taxpayer's liability to pay it. *United States* v. *Anderson*, 269 U.S. 422 (1926); *Commissioner* v. *H. B. Ives Co.*, 297 F. 2d 229 (C.A. 2, 1961).

In *Champion Spark Plug Co.*, 30 T.C. 295, affd. 266 F. 2d 347 (C.A. 6, 1959), we said that the accrual of an item as a deduction is dependent upon the existence, in the taxable year for which the deduction is sought, of a fixed and definite obligation to make such payment. We do not think the termination of the contract in 1956 definitely fixed petitioner's liability to pay Guinness any fixed amount for breach of the contract. Petitioner was not finally committed to the payment to Guinness of any definite amount. Neither the resolution of petitioner's board of directors terminating the contract nor the accrual of the $600,000 of minimum royalties in its books as a liability had the effect of fixing petitioner's obligation for payment of that amount. In *Commissioner* v. *H. B. Ives Co., supra* at 230, the court said:

Thus neither the resolution of respondent's board of directors, nor the entry on its books, in themselves establish the proper accrual of the claimed liability in 1953. Deduction could be claimed only when the liability to pay became certain. * * * [Citing *United States* v. *Anderson, supra; United States* v. *Olympic Radio & Television*, 349 U.S. 232; and *United States* v. *Consolidated Edison Co.*, 366 U.S. 380.]

Petitioner evidently did not consider its obligation to pay Guinness $600,000 fixed and definite in 1956 for, after notifying Guinness of cancellation of the contract, it promptly began negotiating with Guinness for a more favorable settlement which culminated in 1957.

Petitioner argues that the propriety of the accrual of the minimum royalties in 1956 should be determined on the facts as they existed at the close of that year and that the evidence relating to subsequent events, such as the negotiations for final settlement and the payment of $275,000 in 1957, is immaterial and was improperly admitted in evidence. The subsequent events are pertinent but have been given weight only as they bear on the position of the parties as of December 31, 1956. Subsequent events were considered in *General Communication Co.*, 33 T.C. 640 (1960), and were found to affect adversely the taxpayer's claim for the accrual of a liability for breach of contract. The situation here, in fact, resembles that in the *General Communication Co.* case. There, the taxpayer sought to accrue in 1954 a liability for breach of contract occurring within that year. Holding against the taxpayer, we said (p. 653):

In *Dixie Pine Products Co.* v. *Commissioner*, 320 U.S. 516, 519, it was regarded as settled law "that in order to truly reflect the income of a given year, all the events must occur in that year which fix the amount and the fact of the taxpayer's liability for items of indebtedness deducted though not paid; and this

cannot be the case where the liability is contingent and is contested by the taxpayer." And in *Lucas* v. *American Code Co.*, 280 U.S. 445, 450, it was stated that an accrued liability is not to be regarded as fixed unless there is "a definite admission of liability, negotiations for settlement are begun, and a reasonable estimate of the amount of the loss is accrued on the books." * * *

We added the following additional quotation (p. 655):

We are of the opinion that the liability which petitioner attempted to accrue as of September 30, 1954, was neither fixed nor uncontested at that time; it was in the nature of a reserve for contingencies, justified perhaps for purposes of sound business accounting but too uncertain to permit of deductibility.

The facts, we think, fail to show that, on the cancellation of the contract and at December 31, 1956, petitioner was immediately and legally obligated to pay Guinness $600,000 of royalties, or that petitioner had admitted the liability for such amount or that the $275,000 which petitioner ultimately did pay Guinness was in settlement of such obligation.

The picture rather is an effort on the part of petitioner to juggle or accelerate unilaterally the accrual of a liability for the purpose of selecting an accrual year which would result in a substantial tax benefit, i.e., in this instance, a substantial carryback.

In any event, in our opinion, petitioner has failed to establish an accrual of $500,000 (out of $600,000) for the year ending December 31, 1956, in relation to minimum royalties.

*Decision will be entered under Rule 50.*