W. S. BADCOCK CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 676–71.   Filed November 20, 1972.

*Sherwin P. Simmons* and *Harold W. Mullis, Jr.,* for the petitioner.
*Vernon J. Owens,* for the respondent.

WITHEY, *Judge:* Respondent determined deficiencies in petitioner's income tax as follows:

| FYE June 30— | Deficiency |
| --- | --- |
| 1964 | $169, 943. 24 |
| 1966 | 11, 264. 14 |
| 1967 | 675, 883. 71 |
| 1968 | 170, 209. 44 |

[9] Cf. *A. E. Adams,* 22 T.C.M. 1215.

The issues presented for our consideration are:

(1) Whether petitioner is entitled to accrue and deduct unpaid dealer commissions under sections 446 and 461 of the Internal Revenue Code of 1954; and

(2) Whether, in adjusting taxable income of petitioner under section 481 of the Code, all of the years prior to July 1, 1966, are barred by the statute of limitations; and if not, whether a cutoff as of June 30, 1966, would be more proper than that used by respondent.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found and incorporated herein by this reference.

W. S. Badcock Corp., the petitioner, is a Florida corporation which had its principal place of business at Mulberry, Fla., on January 29, 1971, the date the petition herein was filed.

The petitioner filed its Federal corporation income tax returns (Form 1120) for the taxable years ended June 30, 1964, 1966, and 1967, with the director of internal revenue at Jacksonville, Fla. Petitioner filed its return for the taxable year ended June 30, 1968, with the director at Chamblee, Ga.

With respect to the taxable year ended June 30, 1966, consents extending the statute of limitations upon assessment were entered on March 27, 1969, July 3, 1969, and February 26, 1970, extending the limitations date to December 31, 1970.

The petitioner filed a corporation application for tentative refund from carryback of net operating loss or unused investment credit (Form 1139) with the director at Jacksonville on December 11, 1967, based on a claimed net operating loss carryback of $328,919.98 and a claimed investment credit carryback of $2,176.08, both from the taxable year ended June 30, 1967, to the taxable year ended June 30, 1964. Based on the above application, a tentative refund was made by the director to petitioner on January 24, 1968, in the amount of tax of $169,943.24 and interest of $5,740.82.

Petitioner was incorporated by Wogan S. Badcock, C. M. Sparkman, and M. J. Whidden under the laws of the State of Florida on March 10, 1926. From the date of its incorporation to the present, petitioner's principal office has been in Mulberry, Fla., a town about 34 miles to the east of Tampa, Fla.

Wogan S. Badcock and his family have owned substantially all of the outstanding stock of petitioner since its formation. The stock interests of C. M. Sparkman and M. J. Whidden (both deceased) were either purchased by the Badcock family or petitioner over the years.

Since its formation, including the taxable years here involved, peti-

tioner has been engaged as a dealer in the sale at retail of household furniture and appliances.

Petitioner makes its sales through company-owned and -operated stores and through dealer associate stores.

The business of a dealer is neither owned nor operated by petitioner. It is owned and operated by a third party under a written contract or oral agreement with petitioner. The merchandise sold by a dealer under its arrangement with petitioner is at all times owned by petitioner from the time it is shipped from the manufacturer through the sale to the customer. Petitioner delivers the merchandise on consignment to the dealer for sale.

Under their arrangements with petitioner, the dealers may sell lines of merchandise which are not in competition with that owned by petitioner and consigned to the dealer for sale.

Petitioner makes its sales through company-owned and -operated warehouses them at its headquarters in Mulberry prior to shipment on petitioner's own trucks to the retail stores. Occasionally, for convenience, petitioner's merchandise is shipped direct by the manufacturer to the retail outlets.

A dealer's operation is completely independent of petitioner—a dealer owns or leases his own premises; hires and fires his own employees; keeps his own books of account; and files his own tax returns. The proceeds and receivables from the sale of merchandise not owned by petitioner belong to the dealer; and petitioner has no interest therein. Such proceeds and receivables are not involved in these proceedings.

Most sales, whether through company-owned or dealer stores, were made on a revolving-type charge account to which there was applied an appropriate finance charge on the unpaid balance. In the taxable years here involved, some sales were also made on an installment purchase plan which included a carrying charge. Such purchase plan has since been terminated.

All proceeds and accounts receivable [1] from the sale of merchandise consigned to the dealers and owned by petitioner belong to petitioner.

During the taxable years involved, collection of receivables was made through the dealer and deposited to a petitioner-owned transfer account. Under the petitioner's transfer account arrangements, the dealer or petitioner could write a check on such account. The dealer customarily wrote the check and transmitted the same, usually by mail, to petitioner. The dealer was not able to draw on a transfer account for any other purpose. The dealer, with certain exceptions,

---

[1] All references in these proceedings to "receivables" are to receivables from the sale of petitioner's merchandise unless otherwise clearly indicated.

noted hereinafter, remitted the report of his collections to petitioner one to three times each week. Collections were deposited by the dealer on the same day or as much as 3 days after the day of collection. Following the deposit to the account, an additional delay of 1 to 5 days was encountered before the collections were actually deposited in the petitioner's general corporate checking account. Between the date of collection by the dealers and the date of initial deposit into a transfer bank account, the dealers had custody of the funds collected and such sums were used by the dealers to finance the daily operations of their respective businesses. The sums thus involved were referred to as the dealers' float.

During the taxable years here involved, the dealers' float, computed on a business-day basis (260 business days per taxable year), was as follows:

| TYE June 30— | Per business day | | |
| --- | --- | --- | --- |
| | High | Low | Average |
| 1966 | $121,980 | $12,679 | $34,140 |
| 1967 | 143,919 | 18,934 | 45,060 |
| 1968 | 196,301 | 23,997 | 54,627 |

Prior to depositing collections, the dealer retains such sums therefrom as may be necessary to reimburse him for attorneys' fees and court costs in collecting delinquent accounts and for repossessions; for costs incurred in repairing appliances and furniture; and for adjustments in commissions paid on collections. Any such retainages are made by the dealer both with and without prior approval of petitioner and are supported by vouchers transmitted by the dealer to petitioner. Since its formation to the present, including the taxable years here involved, the dealers have also retained such sums from the amounts collected as they may need from time to time for their own personal use and which represent an advance payment of commissions on sales of merchandise. The retainages occur both with and without prior knowledge of petitioner. No interest is charged by petitioner with respect to the advances on commissions. Retainages for the taxable years here involved were as follows:

| TYE June 30— | Retainages not including advances on commissions | Advances on commissions |
| --- | --- | --- |
| 1966 | $115,146 | [1] $7,486 |
| 1967 | 133,142 | 40,865 |
| 1968 | 161,395 | 15,057 |

[1] Does not include first 8 months of 1966 because data unavailable.

For their services in selling petitioner's merchandise, the dealers receive a commission based on a percentage of the authorized selling price. Actual payment of the commission is made as the selling price

is collected. If an account is not collected, no commission is paid. For their services in collecting receivables, including delinquent receivables and repossessions, the dealers are paid a percentage commission on all finance charges collected (including carrying charges on installment plan sales in the taxable years here involved). If the account becomes delinquent so that the finance charge thereon is not paid, the next month's finance charge is computed on the original principal amount due plus the delinquent finance charge, and the dealer in effect gets a percentage commission on the delinquent finance charge. Settlement of commissions is made by petitioner with its dealers on a monthly basis, the month for a particular dealer being the billing month for the receivables originating from that dealer. During the taxable years here involved and for some years prior thereto, the amount of the percentage commissions for most dealers was 25 percent on sales of merchandise and 25 percent of finance charges. During the taxable years involved, a few dealers of long standing received a commission rate greater than 25 percent.

Historically, the contractual arrangements between the petitioner and the dealers took four forms: An oral agreement; a short letter agreement; a longer letter agreement; and a more formal dealer contract.

A typical example of a short letter agreement entered into primarily in the late 1930's is as follows:

DEAR MR. BADCOCK:

Am writing to let you know I will be glad to continue the dealership for the sale of your merchandise in Kissimmee on a consignment basis as per our conversation and accept your proposition as outlined below, effective as of November 1st, 1939.

I am to get 25% on time sales made at list time prices when you finance the contracts, *my part or profit payable only as the money is collected by me* or my employees and 15% on cash sales made at your list cash prices. Should I desire to finance any contracts myself it is understood I have the right to do so and make the difference. [Emphasis added.]

Petitioner and some of its dealers used a longer letter agreement from October 1947 to November 1960. Wogan S. Badcock, Sr., co-incorporator and principal owner of petitioner, directed the preparation of the long letter form dealer contracts. Paragraph 2 of the long letter contract provided as follows with respect to the payment of commissions:

That you will pay me (except as herein otherwise provided) on or before the tenth day of each month a commission of twenty-five (25%) per cent of the authorized selling price, as the money is collected by me. *It being understood that no commissions will be earned is due me [sic] unless payments are collected by me, said commission becoming due for payment to me only after the monies created by the sale thereof are collected by me and received by you.* [Emphasis added.]

The petitioner and the dealers used a more formal dealer contract first entered into in December 1960. Paragraph I B of the dealer contract (and the one which involves the bulk of commissions involved herein) provides as follows:

B. AMOUNT AND METHOD OF COMMISSION ON CONSIGNED MERCHANDISE. That for all merchandise consigned by the Owner to the Dealer and sold by the Dealer, the Owner will pay, on or before the 10th day of each month, a commission of 25% of the authorized selling price and finance charges, such payments to be made as the money is collected by the Dealer, *with the understanding, however, that no commission is earned or due unless and until payments are collected by the Dealer and remitted to the Owner.* In the event the dealer should discount either the authorized selling price or finance charges, the commission due the Dealer shall be reduced by the amount of such discount. [Emphasis added.]

One additional contractual form was used in August 1947, only in connection with the Micanopy dealership. Paragraph 2 of the Micanopy dealer contract provided as follows with penciled additions and changes to the original contract form shown in brackets:

That you will pay * * * [us] (except as herein otherwise provided) on or before the tenth day of each month a commission of twenty-five (25%) per cent of the * * * [authorized] selling price, * * * [(as the money is collected by us. It being understood that no commissions will be earned is due us [sic] unless payments are collected by us)], *said commission becoming due for payment to* * * * [us only] *after the monies created by the sale thereof are* [collected by us and] *received by you.* [Emphasis added.]

Such dealership was sold in November 1950 with the acquiring dealer entering into the longer letter agreement contract then in use. During the taxable years 1966, 1967, and 1968, the various forms of dealer contracts, including oral arrangements, in use were as follows:

| TYE June 30— | Oral | Short letter form | Long letter form | Dealer contract | Total |
|---|---|---|---|---|---|
| 1966 | 5 | 1 | 11 | 45 | 62 |
| 1967 | 5 | 0 | 9 | 50 | 64 |
| 1968 | 4 | 0 | 9 | 59 | 72 |

Where there were oral arrangements, such oral arrangements commenced prior to January 1, 1954, and continued through the taxable years here involved. Commissions on merchandise sold and finance charges under such oral agreements were paid in the same manner as described hereinabove.

The accounting and billing for all receivables originating from dealers and company-owned stores were handled by petitioner at its Mulberry headquarters. Customers were directed on the billing statement to remit their monthly payments to the local retail store. Any payments sent direct to petitioner's headquarters were transmitted by

petitioner to the appropriate retail store for retransmittal to petitioner along with that store's other collections.

A selling dealer had the primary responsibility for collecting delinquent accounts, including the institution of legal proceedings therefor. Merchandise repossessed or turned back by a delinquent charge customer as the result of collection proceedings was refurbished by the dealer and petitioner and resold as used furniture and appliances. All such merchandise was owned by petitioner and was reconsigned to the dealer at the time the merchandise was reacquired. On any such sales, the dealer received the applicable commission, including commissions on finance charges, as on sales of new merchandise.

Pursuant to the terms of petitioner's contractual arrangements with its dealers, petitioner received collections from the dealers periodically during the month; and the amounts were generally retained by petitioner and the applicable commissions were remitted to the dealers on or before the 10th day of the month (customarily on or about the eighth day of the month) following the month of collection. During the taxable years involved, the average amounts of the monthly commission payments were as follows:

| TYE June 30— | Average monthly commission |
|---|---|
| 1966 | $215, 871 |
| 1967 | 250, 316 |
| 1968 | 291, 357 |

From time to time, dealers sold their businesses either directly to third parties or indirectly through petitioner to third parties. In computing the sales price of a dealership, the accounts receivable generated by the selling dealer's store as of the date of sale was reduced by an allowance for bad debts based upon the experience of the selling dealer for the 12-month period immediately preceding the sale and was further reduced by the amount of known uncollectible accounts. The resulting figure was then multiplied by the dealer's applicable commission rate. Added to this amount was a negotiated purchase price for tangible personal property. When a dealer would sell his dealership for less than the "formula price" petitioner would pay the succeeding dealer the full 25-percent commission as the succeeding dealer collected the sales prices.

Petitioner has never been sued by a dealer in connection with a complaint concerning dealer commissions.

Dealers from time to time borrow from banks, third parties, and occasionally from petitioner, wherein the commissions are either used as collateral or given consideration by the lender in making the loan.

The experience on such loans during the taxable years here involved was as follows:

| Lender | Number of loans | | | Aggregate amount | | |
|---|---|---|---|---|---|---|
| | 6/30/66 | 6/30/67 | 6/30/68 | 6/30/66 | 6/30/67 | 6/30/68 |
| Wogan S. Badcock, Sr | 2 | 9 | 5 | $5,444 | $82,984 | $18,792 |
| W. S. Badcock Corp | 1 | 5 | 8 | 4,000 | 41,000 | 54,666 |
| Unrelated persons | 1 | 6 | 9 | 1,627 | 70,379 | 247,099 |
| Banks | 0 | 0 | 4 | 0 | 0 | 72,721 |
| Total | 4 | 20 | 26 | 11,071 | 194,363 | 393,278 |

Net sales and finance charge income for the taxable years here involved and accounts receivable (all forms) at the end of each year were as follows:

| Taxable year ended | Net sales | Finance charge income | Accounts receivable at yearend |
|---|---|---|---|
| 6/30/66 | $13,301,270 | $950,289 | $7,728,625 |
| 6/30/67 | 15,573,260 | 1,621,210 | 9,527,519 |
| 6/30/68 | 17,446,003 | 1,871,063 | 11,179,457 |

Commissions accrued by petitioner at yearend during the taxable years here involved as reflected by the form of contract were as follows:

| TYE June 30— | Number of dealers | Oral | Short letter form | Long letter form | Dealer contract | Total |
|---|---|---|---|---|---|---|
| 1966 | 62 | $225,048 | $21,289 | $391,238 | $1,071,053 | $1,708,628 |
| 1967 | 64 | 242,556 | | 369,436 | 1,477,506 | 2,089,498 |
| 1968 | 72 | 210,549 | | 400,877 | 1,826,397 | 2,437,823 |

The commissions deducted (including commissions accrued at yearend) by petitioner on its tax returns for the taxable years here involved, by form of contract, were as follows:

| TYE June 30— | Oral | Short letter form | Long letter form | Dealer contract | Total |
|---|---|---|---|---|---|
| 1966 | $326,961 | $37,134 | $637,899 | $1,766,822 | $2,768,816 |
| 1967 | 357,359 | | 616,039 | 2,335,375 | 3,308,773 |
| 1968 | 296,321 | | 640,882 | 2,797,374 | 3,734,577 |

The amounts accrued by petitioner as deductions for dealer commissions on its tax returns for all years, including the taxable years here involved, were computed at the end of each taxable year after taking into consideration bad debt experience. The computation of accrued dealer commissions at the end of each taxable year is made

on a store-by-store basis and then aggregated. The computation for a single store is as follows:

| Accrued dealers commissions at June 30 | = | Accounts receivable at yearend, minus unearned finance charges, minus an appropriate provision for bad debts, times the applicable percentage, plus commissions to be paid on June collections ("June settlements"). |
|---|---|---|

For all years from its formation until the present, including the taxable years ended June 30, 1966, 1967, and 1968, petitioner consistently kept its books of account and reported to its shareholders and creditors under the accrual method of accounting in accordance with generally accepted accounting principles. Petitioner also filed its Federal income tax returns on the accrual method of accounting.

In the taxable year ended June 30, 1967, petitioner elected to report the profits from the sale of furniture and appliances made under revolving credit plans on the installment method of reporting income provided by section 453 of the 1954 Code. The gross profit on installment payments actually received by petitioner during the taxable years 1967 and 1968, with respect to sales made prior to July 1, 1966, was as follows:

| TYE June 30— | Gross profit received |
|---|---|
| 1967 | $1,156,455.82 |
| 1968 | 331,115.67 |

The parties have stipulated that if the Court finds that the unpaid dealer commissions (other than amounts of June settlements described hereinabove) were accruable expense for the taxable years ended June 30, 1967 and 1968, then petitioner's method of accounting clearly reflects income within the meaning of sections 446 and 461 of the Code based on petitioner's use of the accrual method of accounting and its election to report on the installment method under section 453 of the Code.

On its returns for the taxable years ended June 30, 1967 and 1968, petitioner claimed deductions for dealer commissions of $3,308,772.38 and $3,734.577.17, respectively. Financial statements of petitioner reflect that of those amounts claimed, $2,089,498.69 in 1967 and $2,437,-822.88 in 1968 represent accrued but unpaid dealer commissions on merchandise sold by the dealers.

In the statutory notice of deficiency, respondent determined that the accrued portion of the claimed dealer commission deductions was not deductible and accordingly adjusted taxable income by the amount of the accrual as of the beginning of the taxable year ended June 30, 1967, $1,708,628.88, and by the amounts of the increase in the accruals as of the end of the taxable years ended June 30, 1967 and 1968, of $380,869.81 and $348,324.19, respectively, as adjusted for the June

1967 and 1968 settlements of $250,230.08 and $300,426.70, respectively, or net increase in accruals of $130,639.73 and $298,127.57, respectively. It is agreed that the $1,708,268.88 on petitioner's books as accrued dealer commissions contains a June 1966 settlement of $226,823.91. The claimed accrual as of the taxable year ended June 30, 1966, is $1,481,804.97, and the net increase in the accruals for the taxable year ended June 30, 1967, is $357,463.34 instead of $130,639.73.

The Internal Revenue Service has examined petitioner's income tax returns in 10 different examinations covering the following taxable years ended June 30: 1933; 1934; 1935; 1936 and 1937; 1938 and 1939; 1940 and 1941; 1943; 1953, 1954 and 1955; 1961 and 1962; and 1966, 1967, and 1968.

For all years since its formation to the present, petitioner has deducted dealer commissions on the same basis as claimed in its tax returns for the taxable years ended June 30, 1967 and 1968, except for an adjustment for the bad debt reserve required by the Internal Revenue Service as a result of an audit of petitioner's tax returns for the taxable years ended June 30, 1961 and 1962.

The parties have stipulated that if the Court finds that the commissions were not properly accruable and deductible expenses under sections 446 and 461 of the Code, then and in that event it is agreed that the commission adjustments for the taxable years here involved result from a change in method of accounting initiated by respondent to which section 481 applies and that the net adjustment under section 481 is $916,384.67 (i.e., $1,481,804.97 as computed hereinabove less the June 1955 accrued commissions of $631,223.97, reduced by June 1955 settlement of $65,803.67).

### ULTIMATE FINDING

Petitioner's legal liability to pay the commissions involved herein arose only upon collection and remission by the dealer of the sales price of the merchandise to petitioner.

### OPINION

### *Issue 1*

Respondent determined that the amounts of unpaid dealer commissions on June 30, 1967, and on June 30, 1968, were not accruable expenses and were not deductible for those taxable years by the petitioner under sections 446 and 461 of the Code of 1954. Essentially it is respondent's position that under the explicit terms of the dealer contracts and the consistent practice of the parties, the fact of petitioner's legal liability for the commissions was not fixed and definite

until the sales price of the merchandise was collected and hence petitioner was not entitled to deduct the accrued but unpaid commissions in question. To the contrary, petitioner contends that its liability to compensate its dealers in full for sales which they had made during the taxable years involved, notwithstanding the language of the dealers' contracts, was fixed and determinable in amount with reasonable certainty at the time the dealer consummated the sale.

Section 446 of the 1954 Code [2] authorizes the use of an accrual method of accounting and gives respondent the broad discretion to compute taxable income under a method of accounting which, in his opinion, clearly reflects income. See *Lucas* v. *American Code Co.*, 280 U.S. 445 (1930). Respondent has not questioned petitioner's status as an accrual method taxpayer. Section 461(a) of the Code provides that:

The amount of any deduction * * * allowed by this subtitle shall be taken for the taxable year which is the proper taxable year under the method of accounting used in computing taxable income.

Section 1.461-1(a)(2), Income Tax Regs., sets forth the general rule for determining the proper year for deduction by an accrual method taxpayer:

Under the accrual method of accounting, an expense is deductible for the taxable year in which *all the events have occurred which determine the fact of the liability* and the amount thereof can be determined with reasonable accuracy. * * * While no accrual shall be made in any case in which all of the events have not occurred which fix the liability, the fact that the exact amount of the liability which has been incurred cannot be determined will not prevent the accrual within the taxable year of such part thereof as can be computed with reasonable accuracy. * * * [Emphasis added.]

See also *Security Mills Co.* v. *Commissioner*, 321 U.S. 281, 284 (1944); *Dixie Pine Co.* v. *Commissioner*, 320 U.S. 516, 518–519 (1944); *Brown* v. *Helvering*, 291 U.S. 193 (1934); *United States* v. *Anderson*, 269 U.S. 422, 440–441 (1926); *Commissioner* v. *H. B. Ives Co.*, 297 F. 2d 229 (C.A. 2, 1961); *Goebel Brewing Co.*, 43 T.C. 8, 15 (1964).

---

[2] SEC. 446. GENERAL RULE FOR METHODS OF ACCOUNTING.

(a) GENERAL RULE.—Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books.

(b) EXCEPTIONS.—If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary or his delegate, does clearly reflect income.

(c) PERMISSIBLE METHODS.—Subject to the provisions of subsections (a) and (b), a taxpayer may compute taxable income under any of the following methods of accounting—

(1) the cash receipts and disbursements method;

(2) an accrual method;

(3) any other method permitted by this chapter; or

(4) any combination of the foregoing methods permitted under regulations prescribed by the Secretary or his delegate.

The crux of the issue herein is whether the petitioner was legally obligated to pay the dealer commissions to its dealers upon the sale by the dealers of the merchandise during the taxable years 1967 and 1968 irrespective of whether or not payment would ultimately be collected. In our opinion, both the language of the contracts involved and the general practice of the parties reveal that petitioner was not obligated to pay the commissions upon the sale.

Analysis of the record shows that the bulk of the commissions involved herein arose out of the formal dealer contracts and under such agreements the dealer associate stores had the primary responsibility both for the sale of the furniture and appliances (on consignment from petitioner) as well as the collection of the sales price. Except for the obvious incorrect grammatical use of "is" in the long letter contract, the dealer agreements have been uniformly clear and unequivocal. Neither the fact of liability nor the legal obligation to pay the commissions was created until the dealer collected the sales price and remitted those collections to the petitioner. Only upon remittance of the collections to petitioner did it become legally obligated to pay the commissions. However, petitioner, during the taxable years in issue and for numerous years prior thereto, had been deducting in the year of sale an estimated amount for commissions which it anticipated would be paid to its dealers.

It is well settled law of contracts in Florida, as well as most other jurisdictions, that the terms of an unambiguous contract are to be construed to mean exactly what the language implies and nothing more. 7 Fla. Jur., Contracts, sec. 74, pp. 138, 139 (1940). Not only has the language of the agreements herein been consistently unambiguous, the parties have consistently complied with that language. No dealer has ever sued petitioner to raise an issue with regard to the contracts. The instances where petitioner has either actively permitted or passively acquiesced in the dealers' retention of advances on commissions have been few and have involved relatively small amounts in comparison to the amounts at issue here. These exceptions to the general practice in our view demonstrate that the general rule followed by petitioner was otherwise.

Petitioner, citing *Bohman* v. *Berg*, 8 Cal. 441, 356 P. 2d 185 (1960), and *Mitau* v. *Roddan*, 149 Cal. 1, 84 Pac. 145 (1906), contends that the interpretation placed upon a contract by the parties controls even when such interpretation is apparently contrary to the meaning of the contract's provisions. We find these cases inapposite to the instant case. Through uncorroborated oral testimony, petitioner seeks to change a clear contract in order to contest the tax consequences of his agreement as construed by the respondent. Petitioner, who has the

burden of proof, has not offered any evidence that the terms of the agreements before us are ambiguous. Nor has petitioner adduced any affirmative "proof which in an action between the parties to the agreement would be admissible to alter the construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc." *Commissioner* v. *Danielson*, 378 F. 2d 771 (C.A. 3, 1967).

Moreover, petitioner may not vary the terms of its agreement by oral testimony since it has been generally held that parties are bound by their written agreements unless they can produce strong proof showing that a different result from that specified in the agreement was intended. *Ullman* v. *Commissioner*, 264 F. 2d 305 (C.A. 2, 1959), affirming 29 T.C. 129 (1957); *Hamlin's Trust* v. *Commissioner*, 209 F. 2d 761 (C.A. 10, 1954), affirming 19 T.C. 718 (1953); *Edmond E. Maseeh*, 52 T.C. 18 (1969). In our judgment, petitioner's self-serving statements are inadequate to impeach the clear terms of its written agreements, and thus it has not produced the strong proof necessary to vary the contract's terms. The record shows that in actual practice the dealer was not paid his commissions until he had effected collection and remitted the money to petitioner, and then only to the extent of the commission rate of 25 percent times the collection. That practice is in accordance with the plain import of the contract.

Notably, petitioner who had executed numerous contracts with its associate dealers during many years did not present any dealer as a corroborating witness to support its position. We believe that at least one of the dealers could presumably have explained the modus operandi of its business transactions with petitioner, particularly with respect to the event which gave rise to the liability for payment of the commission, if it had been favorable to petitioner's cause. *Wichita Terminal Elevator Co.*, 6 T.C. 1158 (1946), affd. 162 F. 2d 513 (C. A. 10, 1947).

Liability does not accrue so long as it remains contingent and the mere fact that an amount which will be paid can be estimated with reasonable accuracy is not sufficient to support its accrual. *Oberman Manufacturing Co.*, 47 T.C. 471, 477 (1967). "The accruability test of a debt is not certainty of payment, but rather certainty of its liability." *Transcalifornia Oil Co., Ltd.*, 37 B.T.A. 119, 127 (1938). In the instant case, liability for payment of the commissions depended on a condition precedent, i.e., whether or not the dealer had collected the selling price of the merchandise involved and had remitted the money to the petitioner as required in the contract. In our view, at the time of sale, the dealer had at best a potential commission credit; but the credit did not represent an actual liability of the petitioner. See *Field Enterprises, Inc.* v. *United States*, 348 F. 2d 485, 488 (Ct. Cl. 1965).

The fact that between the date of collections by the dealers and the date of the initial deposit thereof into a transfer bank account, the dealers had custody of the money collected and such funds ("dealers' float") were used by the dealers to finance some of their daily operations does not alter our conclusion that petitioner did not have a definite, fixed, and unconditional obligation to pay the commissions in question at the time of sale. See *Guardian Investment Corporation* v. *Phinney*, 253 F. 2d 326 (C.A. 5, 1958); *Swain & Myers, Inc.*, 42 B.T.A. 306 (1940).

In support of its position, petitioner relies upon, *inter alia*, *Ohmer Register Co.* v. *Commissioner*, 131 F. 2d 682 (C.A. 6, 1942); *Helvering* v. *Russian Finance & Construction Corporation*, 77 F. 2d 324 (C.A. 2, 1935); *Warren Co.*, 46 B.T.A. 897 (1942), affd. 135 F. 2d 679 (C.A. 5, 1943); and Rev. Rul. 72–34, 1972–1 C.B. 132. We have carefully considered each of these authorities and find them distinguishable on their facts. In *Ohmer Register Co.* v. *Commissioner*, *supra* at 686, the taxpayer and its agents treated the unpaid commissions as earned and definite obligations at the time of sale. In holding that the taxpayer, which kept its books on the accrual basis, was entitled to deduct the full amount paid for salesmen commissions immediately upon acceptance of sales orders, the Court pointed out that "the right to deduct an expense item accrues when the fixed obligation is incurred, even though the amount may be diminished by subsequent events." Here, on the other hand, petitioner has failed to establish that it had incurred a fixed obligation at the time of sale under the terms of the dealer contracts during the taxable periods in question. In *ABKCO Industries, Inc.*, 56 T.C. 1083 (1971), on appeal (C.A. 3, Jan. 28, 1972), it is noted in footnote 6 that *Ohmer Register Co.* must be considered in light of the fact that it was decided in 1942, prior to the Supreme Court's decision in *Security Mills Co.* v. *Commissioner*, *supra* at 287, which casts doubt on some of the reasoning in the Sixth Circuit's opinion in *Ohmer*. Cf. 131 F. 2d at 686. See also *Dixie Pine Co.* v. *Commissioner*, *supra*. In the instant case, petitioner's position is dependent upon there first having been a liability created by the contract at the time of sale. Without there having been a liability created, the balancing of the income with expenses language and reasoning of *Ohmer Register Co.* is irrelevant. First, there must be the fact of liability; then, and only then, is the concept of matching expenses with income required in order to clearly reflect the income involved.

Unlike the case at bar, in *Helvering* v. *Russian Finance & Construction Corporation*, *supra* at 327, the Second Circuit emphasized that the expense there in issue was "absolute and fixed, in that no further event needed to occur to bring it into evidence." Similarly in *Warren Co.*, *supra*, we held on the facts that commissions were deductible by the tax-

payer in the year of sale despite the fact that they were subject to the risk of noncollection. The contract which the taxpayer had with its sales agents was one under which, by its own terms, commissions accrued to the sales agents immediately when sales were made, although only a part of the commission was then payable and the balance was to be paid later when collections were made. This case is dissimilar to the case at bar and is limited to its facts. Likewise, petitioner's reliance on Rev. Rul. 72–34, 1972–1 C.B. 132, is misplaced. The ruling states, in essence, that the Internal Revenue Service will not follow the decision in *Lukens Steel Co.* v. *Commissioner*, 442 F. 2d 1131 (C.A. 3, 1971), affirming 52 T.C. 764 (1969), as a precedent in the disposition of similar cases under section 461 of the 1954 Code. *Lukens Steel Co.* involved a debt that was certain to accrue sometime and the only question was the time of its accruing and the effect of such time on the debt's accruability. In no event could the contingent liability be canceled by the taxpayer under its employment contract. The liability was fixed as to existence and amount by reference to facts existing during the taxable years with its ultimate payment reasonably certain in fact but indeterminate during the years of accrual with regard to the ultimate recipients' shares of the accrued amounts and with regard to the times of actual payouts, the latter being dependent on the reasonably anticipated occurrences of economic events. Here, there was no debt or liability for the commissions until the sales prices were collected and remitted to petitioner. To earn commissions, the dealers here are required to render three services: A sale of the merchandise, a collection of the purchase price, and payment of the purchase price to petitioner.

We reject petitioner's contention that respondent has abused his discretion under section 446 (b) of the 1954 Code in proposing a change in petitioner's method of accounting for dealer commissions because petitioner has used a consistent accounting practice for more than 40 years; respondent has accepted its accrual of commissions for many years through the taxable year ended June 1966, despite nine intervening audits; and respondent considered the same issue in the 1961–62 audit and made only minor adjustments for uncollectible accounts. Section 446 (b) provides that if the method of accounting on the basis of which taxpayer regularly computes his income in keeping books does not clearly reflect income, "the computation of taxable income shall be made under such method as, in the opinion of the Secretary * * * does clearly reflect income." Admittedly, the parties have agreed that the manner in which petitioner kept its books of account and reported to its shareholders and creditors under the accrual method of accounting was in accordance with generally accepted accounting principles. However, a similar finding was made in *American Automobile Assn.* v. *United States*, 367 U.S. 687, 693 (1961), and there the

majority pointed out that such a finding was not the same as a holding that for income tax purposes the accounting method so clearly reflects income as to be binding on the Treasury. Moreover, whatever the treatment of similar expenditures for commissions in the past may have been, we deem it without significance in the instant proceeding. Petitioner's consistent treatment of commissions to dealers in prior years provides us with no aid in resolving the issue involved herein. Respondent is not estopped by his prior acceptance of the taxpayer's method of accounting. *Municipal Bond Corporation*, 41 T.C. 20 (1963), reversed and remanded on other issues 341 F. 2d 683 (C.A. 8, 1965). The law is settled that the "doctrine of equitable estoppel is not a bar to the correction by the Commissioner of a mistake of law." *Automobile Club* v. *Commissioner*, 353 U.S. 180 (1957). We do not believe that respondent has exceeded the bounds of discretion vested in him under section 446 (b).

In light of the foregoing and the record as a whole, we hold that petitioner is not entitled to accrue or deduct the unpaid dealer commissions on June 30, 1967, and June 30, 1968, since such commissions do not qualify as accruable expenses under sections 446 and 461, *supra*. See *Shepherd Construction Co.*, 51 T.C. 890, 898 (1969).

In the notice of deficiency, respondent determined that the accrued portion of the claimed dealer commission deductions was not deductible and accordingly adjusted taxable income by the amount of the accrual as of the beginning of the taxable year ended June 30, 1967, in the amount of $1,708,628.88 and by the amounts of the increase in the accruals as of the end of the taxable years ended June 30, 1967 and 1968, of $380,869.31 and $348,324.19, respectively, or net increase in accruals of $130,639.73 and $298,127.57, respectively. However, the parties agreed that the $1,708,628.88 on petitioner's books as accrued dealer commissions contains a June 30, 1966, settlement of $226,823.91. The revised claimed accrual as of both the end of the June 30, 1966, taxable year and the beginning of the June 30, 1967, taxable year is $1,481,-804.97. The net increase in the accrual during the taxable year ended June 30, 1967, is $357,463.34 instead of $130,639.73. The comparable figure for 1968 is $298,127.57. In view of our conclusion that these accruals were improperly accrued and deducted, we hold further that petitioner's taxable income should be increased by the amounts of $357,463.34 and $298,127.57 for the taxable years ended June 30, 1967 and 1968, respectively.

### Issue 2

In view of our conclusion on the first issue, we adopt the stipulation of the parties that the commission adjustments for the taxable years here involved result from a change in method of accounting initiated

by respondent to which section 481 of the 1954 Code [3] applies and that the net adjustment thereunder is $916,384.67 (i.e., $1,481,804.97 less the June 1955 accrued commissions of $631,223.97, reduced by the June 1955 settlement of $65,803.67). Notwithstanding the agreed application of section 481, *supra*, and the cutoff as of the taxable year ended June 30, 1955, in the computation of petitioner's income for the taxable years ended June 30, 1967 and 1968, petitioner reserved the right to argue alternatively that no part of the commission adjustments shall be based on amounts which were taken into account in computing petitioner's income (or which should have been taken into account in computing its income) for the taxable years ended on or before June 30, 1962, or June 30, 1965, or June 30, 1966.

It is petitioner's position that respondent is attempting to use section 481 to avoid his acceptance of petitioner's treatment of commissions for the taxable year 1966; to circumvent his prior audit agreements with respect to the taxable years 1961 and 1962; and to disavow his acceptance of petitioner's treatment of commissions for all other taxable years. In the same vein, petitioner argues that with the exception of the taxable year ended June 30, 1966, all of the years prior to July 1, 1966, are barred by the statute of limitations; and that a cutoff as of June 30, 1966, would be reasonable. We disagree.

Section 481 was enacted for the express purpose of allowing in the year of change an adjustment of the amount which was improperly accrued and deducted by the taxpayer, whether that amount relates to gross income or deduction "in order to prevent amounts from being duplicated or omitted." *Dearborn Gage Co.*, 48 T.C. 190 (1967); S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess., p. 307 (1954); *Fred P. Pursell*, 38 T.C. 263 (1962), affirmed per curiam 315 F. 2d 629 (C.A. 3, 1963). The change in the treatment of a single material item, such as dealer commissions, may fall under section 481. *Hulond R. Ryan*, 42 T.C. 386, 392 (1964). Section 481 is designed to prevent a distortion of taxable income and a windfall to the taxpayer stemming from a change in accounting at a time when the statute of limitations (sec. 6501(a) of the Code) bars reopening the taxpayer's returns for earlier years. To this effect, see

---

[3] SEC. 481. ADJUSTMENTS REQUIRED BY CHANGES IN METHOD OF ACCOUNTING.
(a) GENERAL RULE.—In computing the taxpayer's taxable income for any taxable year (referred to in this section as the "year of the change")—
(1) if such computation is under a method of accounting different from the method under which the taxpayer's taxable income for the preceding taxable year was computed, then
(2) there shall be taken into account those adjustments which are determined to be necessary solely by reason of the change in order to prevent amounts from being duplicated or omitted, except there shall not be taken into account any adjustment in respect of any taxable year to which this section does not apply unless the adjustment is attributable to a change in the method of accounting initiated by the taxpayer.

*Graff Chevrolet Co.* v. *Campbell*, 343 F. 2d 568 (C.A. 5, 1965), where the issue was whether section 481 gave the respondent power to tax amounts that should have been reported in closed years. Holding that section 481 would be virtually useless if it does not affect closed years, the court said, at page 572:

There is no necessary conflict between section 481 and the statute of limitations. Until the year of the accounting change, the Commissioner has no claim against the taxpayer for amounts which the taxpayer should have reported in prior years. The statute of limitations is directed toward stale claims. Section 481 deals with claims which do not even arise until the year of the accounting change. "When a taxpayer uses an accounting method which reflects an expense before it is proper to do so or which defers an item of income that should be reported currently, he has not succeeded (and does not purport to have succeeded) in permanently avoiding the reporting of any income; he has impliedly promised to report that income at a later date, when his accounting method, improper though it may be, would require it. Section 481, therefore, does not hold the taxpayer to any income which he has any reason to believe he has avoided, and does not frustrate the policy that men should be able, after a certain time, to be confident that past wrongs are set at rest." Note, Problems Arising from Changes in Tax-Accounting Methods, 73 Harv. L. Rev. 1564, 1576 (1960).

Petitioner has not directed our attention to any language in section 481, *supra*, or other relevant authority for its position. In our judgment, section 481 was complied with in detail in the computations involved herein and there is no basis in fact or in law for a cutoff later than that which is set forth clearly in the statute and the correlative regulations thereunder, i.e., sec. 481 (b) (4) of the Code and sec. 1.481-3, Income Tax Regs. Considering the object of the section and its legislative history, and particularly the fact that petitioner has been erroneously accruing the commissions in question since its inception, we do not believe that respondent's adjustments being based on a cutoff as of the taxable year ended June 30, 1955, are unrealistic, or that he should be estopped from applying section 481 by his prior audits of petitioner's returns. *Automobile Club* v. *Commissioner*, *supra*. Accordingly, we sustain respondent on this issue.

*Decision will be entered under Rule 50.*