### WARREN CO., Inc., v. COMMISSIONER OF INTERNAL REVENUE.

#### Nos. 10491, 10492.

Circuit Court of Appeals, Fifth Circuit.

May 18, 1943.

680

W. A. Sutherland, of Atlanta, Ga., for petitioner.

Samuel O. Clark, Jr., Asst. Atty. Gen., Joseph M. Jones and Sewall Key, Sp. Assts. to the Atty. Gen., and J. P. Wenchel, Chief Counsel, Bureau of Internal Revenue, and John T. Rogers, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., for respondent.

Before SIBLEY, McCORD, and WALLER, Circuit Judges.

WALLER, Circuit Judge.

Petitioner, a corporation with its principal office in Atlanta, Georgia, is engaged in the sale of refrigerators on installments, with title retained until the installments are paid. The Board of Tax Appeals determined that, under Section 14, Revenue Act of 1936, 26 U.S.C.A. Int.Rev.Acts, page 823, the petitioner (hereinafter frequently referred to as "the company") had an undistributed profits tax liability in the sums of $28,939.60 and $8,795.30 for the fiscal years ending September 30, 1937, and September 30, 1938, respectively. These appeals are to review the decision of the United States Board of Tax Appeals determining the above tax liabilities. The related case, 10491, involving the fiscal year 1937, was consolidated with case 10492 before the Board and here.

On March 1, 1928, the Company entered into a trust indenture with the Trust Company of Georgia as trustee, securing a twelve year bond issue, by which the company agreed not to pay any dividends as long as any bonds issued thereunder were outstanding and unpaid, unless its current assets would equal at least twice the amount of its current liabilities. Bonds secured by the trust indenture were outstanding during the entire two tax years in question. Therefore, the provision of the trust indenture respecting the payment of dividends was in effect during the taxpayer's fiscal years of 1937 and 1938.

Sections 13 and 14 of Article V of the trust indenture read as follows:

"Section 13: The Company covenants and agrees that it will not pay any dividends on its outstanding capital stock as long as any of the bonds issued hereunder are outstanding and unpaid, unless its current assets will equal at least twice the amount of its current liabilities, after the payment of any dividends; and that it will not pay any dividend except out of current earnings, or out of an undistributed earnings of previous years. In case of any default on the payment of interest, or otherwise, no dividend shall in any event be paid to the Company's stockholders.

"Section 14: The Company covenants and agrees that as long as any bonds issued hereunder are outstanding and unpaid that it will maintain a net current assets which, at their actual value, shall always be at least twice the actual value of all current liabilities. For the purpose of determining net current assets under the provisions of this section, and for the purpose of the preceding sections, current assets and current liabilities are defined as follows:

"Current Assets.

"(a) Cash on hand and in bank;

"(b) Inventories of products (value to be taken at cost or market, whichever is lower) and materials and supplies, both manufactured and in process of manufacture;

"(c) Account receivable after proper deduction for doubtful accounts;

"(d) Bills receivable after proper deduction for doubtful bills;

"(e) United States Government Bonds and other marketable securities.

"Current Liabilities.

"Accounts payable; trade acceptances; bills current and notes current, and any other liabilities other than these bonds."

Section 14(a) (2) of the Revenue Act of 1936, c. 690, 49 Stat. 1648, 26 U.S.C.A. Int.Rev.Acts, page 823, providing for a surtax on undistributed profits contains the following provision: "(2) The term 'undistributed net income' means the adjusted net income minus the sum of the dividends paid credit provided in section 27 and the credit provided in section 26 (c), relating to contracts restricting dividends."

Section 26(c) (1) of the Revenue Act of 1936, c. 690, 49 Stat. 1664, 26 U.S.C.A. Int.Rev.Acts, page 836, making provision for certain credits to be allowed corporations, reads in part as follows:

"Sec. 26. Credits of Corporations.

"In the case of a corporation the following credits shall be allowed to the extent provided in the various sections imposing tax—

\* \* \* \* \*

"(c) Contracts Restricting Payment of Dividends—

"(1) Prohibition on Payment of Dividends.—An amount equal to the excess of the adjusted·net income over the aggregate of the amounts which can be distributed within the taxable year as dividends without violating a provision of a written contract executed by the corporation prior to May 1, 1936, which provision expressly deals with the payment of dividends. \* \* \*"

On August 20, 1931, the company entered into a written agreement with Commercial Investment Trust, Inc., of New York (hereinafter referred to as "C. I. T."), wherein the latter agreed to purchase from the company from time to time deferred installment notes and contracts, received by the company in the disposal of its merchandise, at the rates specified in the written agreement based upon the lengths of maturity of the installment contract. At the time of the purchase C. I. T. paid to the company only ninety per cent of the unmatured installments, withholding ten per cent until the installments had been paid in full by the maker of the paper, whereupon the withheld percentage became payable to the company.

The agreement between the company and C. I. T. contained the following provisions:

" \* \* \* We warrant compliance with all filing or recording requirements, that all statements in paper which we sell to you are true and agree that you may audit our books and records relating to said paper; and warrant that each installment thereof (whether evidenced by a single or by separate obligations) will be paid at or before its maturity but if there shall be default in the payment of any installment or otherwise we agree on request without any tender of paper being required *to repurchase* from you the paper or the entire series of paper on which such default has

occurred at the remaining amount of your investment therein. If we fail *to repurchase* as above agreed within thirty days after request, or if we should become insolvent, cease doing business as a going concern, make an assignment for the benefit of creditors, or if a petition for a receiver or in bankruptcy is filed by or against us, we shall without any tender of paper being required *repurchase* all of the paper which may have been sold to you at the remaining amount of your investment therein, failing which within ten days you may evaluate the paper at public sale after mailing us at least five days notice, at which sale you may purchase for your own protection. The remaining amount of your investment shall mean the amount of your investment as above defined, including accrued interest and all expenses of collection incurred by you after a default and in connection with the enforcement of our agreements herein contained, less all principal sums paid you thereon. You shall at all times have the right to collect all installments on all paper in your possession but until any default shall occur you shall collect at your own cost and expense. All paper shall be duly indorsed or assigned by us to you but should we omit so to do, you and your representatives may place the necessary or appropriate indorsement or assignment thereon." (Emphasis added.)

Installment contracts, in the hands of C. I. T., amounted to the sum of $695,138.36 on September 30, 1937, and $875,700.00 on September 30, 1938, and were considered by the taxpayer as "contingent liabilities". The foregoing sums included the amount of installment contracts sold by the Warren Refrigerator Co. of Beaumont, Texas, to C. I. T. under a contract substantially identical with the contract between the taxpayer and C. I. T., a portion of which has been hereinabove quoted. The taxpayer underwrote or guaranteed to C. I. T. the performance of contract of its affiliate, the Warren Refrigerator Co. of Beaumont; that is to say, it guaranteed or warranted that the Beaumont Company would repurchase its installment paper upon default as covenanted in its said agreement.

The company contends that these "contingent liabilities" are "current liabilities" within the category of "any other liabilities other than these bonds" as defined in its trust indenture; that when its contingent liabilities are added to its other, and well-recognized, current liabilities, its current

assets in the years 1937 and 1938 were not twice the amount of its thusly determined current liabilities, and that, therefore, under the trust indenture it was prohibited from paying dividends, and was within the purview of Section 26(c) (1) of the Revenue Act of 1936 exempting its undistributed profits for those years from liability to the surtax contended for by respondent.

There is no dispute that if the so-called "contingent liabilities" of the taxpayer, arising out of the assigned installment contracts, should be accepted as current liabilities, the assets of the taxpayer in neither of the years would have been twice the liabilities of the company, and it would have been entitled to its claimed dividends paid credit. On the other hand, if they are not such current liabilities, there is no dispute that the current assets of the taxpayer in both years would have been twice the total of its current liabilities, and excess profits could have been distributed without violating the trust indenture. Under the latter postulate the failure to distribute such profits called for the imposition of the surtax in question.

The question for determination, therefore, is whether or not whatever liabilities of the taxpayer after the sale to C. I. T. of the installment contracts were current liabilities as contemplated in the trust indenture securing the taxpayer's bond issue. The Board of Tax Appeals concluded that these amounts were not such current liabilities and that the taxpayer's current assets were at least twice the amount of its current liabilities in each of the years in question, from which it followed that the taxpayer was not within the scope of Section 26(c) (1) of the Revenue Act of 1936, but was liable for the tax as found by the Commissioner.

It is necessary that we consider the written agreement between the company and C. I. T. The company warrants that each installment "will be paid at or before its maturity but if there shall be default in the payment of any installment or otherwise we agree on request * * * *to repurchase* from you the paper or the entire series of paper on which such default has occurred *at the remaining amount of your investment therein.*" (Emphasis added.)

The written agreement further provides that if the company fails to repurchase within thirty days after request, or if it should become insolvent, cease doing busi-

ness as a going concern, make an assignment for the benefit of creditors, or if a petition for a receiver or in bankruptcy is filed against the company "we shall without any tender of paper being required *repurchase* all of the paper which may have been sold to you at the remaining amount of your investment therein." (Emphasis added.)

"The remaining amount of your investment" is defined as the amount of the investment including costs of collection after default, less all principal sums paid on the paper. The costs of collection before default were to be at the expense of the assignee. All paper was to be duly endorsed or assigned by the company, but should the company omit to endorse or assign it, the assignee was authorized to place the assignment or endorsement thereon. It will be recalled that C. I. T. paid the company only ninety per cent of the maturity amount of the installments after taking off its discounts or. charges for handling the paper. This ten percent was an asset of the company, reserved in trust by C. I. T. for its protection.

The only obligation of the company in the event of default in any of the installment payments was to "repurchase" the paper upon request. Title had already passed to C. I. T.

In the face of this agreement C. I. T. could only have required the company to repurchase the notes for the amount remaining due and unpaid thereon after default by the maker. It would have been compelled to have requested repurchase of the installment notes, and upon failure to repurchase, could have then compelled the company to comply with its agreement. Certainly it could not have retained title to the paper and retained title to the merchandise covered thereby, and at the same time sue the company upon its warranty, without a redelivery, or tender, of the paper. Under the wording of the contract the only liability of the assignor was to repurchase the paper—the asset which it had previously sold.

Therefore, before there is any current or definite liability on the part of the company to the C. I. T. the following events are contemplated: (1) The maker must default; (2) the default must be greater than the ten per cent reserved in trust; (3) the assignee must elect not to pursue its remedies against the maker by recovery of the merchandise, or otherwise; (4) the assignee must call upon the assignor to repurchase.

It will be observed that laige down payments were required upon the sale of merchandise on installments. Surely the sales of merchandise and contracts thereunder were made on the assumption that the maker could and would pay for the merchandise. If the default occurred shortly after the purchase of the merchandise and the company were required to repurchase the paper, it would be reacquiring the written obligation of the maker, for whatever it was worth, as well as the title to the merchandise sold. This paper should be considered as a "contingent asset". It would then have the option to repossess the merchandise for which it had already received a large down payment, or it might elect to proceed against the maker in due course of law. Certain it is that when the company buys back the paper, together with the title to the merchandise sold, it has acquired an asset which it did not have before it rebought it.

If, therefore, these so-called contingent liabilities are to be considered as current liabilities, there should be reflected in the books of the company a corresponding, or offsetting asset,—a "contingent asset"— which is a natural concomitant of the repurchase of the paper. True it is that on occasions the company might be required to repurchase the obligation of an insolvent maker who had abused the merchandise covered by the retained title contract, resulting in a loss. The debt might not be collected, and would be charged off as a bad debt in the usual course of business. Until and unless such a loss has resulted it is difficult for the Court to understand how the amount could be ascertained. In the event of such a loss on the asset, it would be a business loss on paper repurchased from C. I. T. rather than a contingent liability.

Since the written contract between company and C. I. T. is one requiring a repurchase of assets, with which assets the company is free to do as it pleases, it certainly must follow that the entire amount of the so-called contingent liabilities cannot be set up to avoid the tax in question without also taking into consideration the corresponding or concomitant asset that will be acquired in the repurchase. Nowhere in the company's books do we find included these corresponding, concomitant, or contingent assets. If the liability to re-

purchase the paper is a contingent liability, the paper is an offsetting and contingent asset, and if the contingent liabilities are to be reflected in the balance sheet, the contingent assets should also be taken into account.

The Court is unable from the record to ascertain the value of the assets that will be acquired by the taxpayer upon the repurchase of any defaulted installment contract. Assuredly many of the installment contract makers will pay a substantial part of the installment. When default occurs in such cases, the company may repossess the merchandise for the remaining small balance due. It has already gotten a substantial down payment. The likelihood is that the repossessed merchandise will be an asset of greater value than the amount paid to repurchase. To what extent this is true the Court is without knowledge. But the company seeks to have the entire amount of its discounted paper—the face value thereof, not the remaining amount due on installments—credited as a current liability, notwithstanding the fact that the makers of these installment contracts may have paid thousands of dollars thereon. Each time a maker makes a payment on a contract, the cost of repurchase is reduced by that amount. We, therefore, cannot ascertain from the record either the amount of the actual so-called contingent liabilities or the amount required to repurchase, nor can we ascertain from the record the amount of the offsetting asset to be acquired in the repurchase.

The corporation has the burden of bringing itself within Section 26(c) (1) because it grants a special credit in the nature of a deduction, and "the taxpayer must sustain the burden of showing compliance with its exact terms". Helvering v. Ohio Leather Company, 317 U.S. 102, 63 S.Ct. 103, 106, 87 L.Ed. ——. It is a salutary rule that the burden of proof should be on the taxpayer in such instances. On September 30, 1938, the taxpayer had only $26,000.00 of bonds outstanding. Under the trust indenture so long as any of the bonds were outstanding the taxpayer in the instant case would not be required to distribute its profits or to pay a surtax thereon until and unless its assets were double its liabilities. It might arrange to pay all of its outstanding bonds except one and continue to refuse to pay dividends to its stockholders, or to pay the surtax on its undistributed profits. The greater the value of the business transacted, the greater would be its contingent liabilities. Its liabilities for discounting paper could be all out of proportion to its assets, and at the same time it might accumulate a substantial profit contrary to the spirit, intent, and purpose of the law. The foregoing is by way of illustration and not intended to charge that the taxpayer in the instant case has so done. Nevertheless, it illustrates the wisdom of the rule that requires the taxpayer to assume and discharge the burden of showing that he is definitely within the Act. In the present case the taxpayer has not clearly shown his actual contingent liabilities, nor has he shown as an offset to such alleged contingent liabilities the value of the asset that it will acquire in the discharge of the alleged contingent liability.

The trust indenture (Section 14) undertook to define "current liabilities". Under that heading is found "accounts payable, trade acceptances, bills current, and notes current, and any other liabilities other than these bonds". The words "other liabilities" being defined under the heading of "current liabilities" must refer to any other "current liabilities" as distinguished from liabilities other than current. We are unable to conclude that the so-called contingent liabilities can be, or were intended to be, classified as current liabilities under the trust indenture.

The phrase "current liability" carries with it the idea of a liability that is presently enforceable. The phrase "contingent liability" connotes a liability that may or may not accrue. "Contingent is the antithesis of current".

In Cheatham Chemical Co. v. Cheatham, 62 Ga.App. 543, 8 S.E.2d 720, 722, the Court said: " * * * A contingent liability is a potential liability, not an *absolute* liability existing in the present, but one which may become an absolute liability upon the happening of a future event. As defined by Webster, 'contingent' in accounting means 'dependent on the occurrence of some event as yet undetermined; as contingent assets or liabilities'. This construction of 'contingent liability' is reinforced, by analogy, by considering the situation of one who indorses, without more, his name on the back of a promissory note. In such a case his liability to pay is not *absolute*. Until the maturity of the note and the compliance by the owner of certain statutory require-

ments his liability is only *contingent*. But it is a contingent liability which *exists* in praesenti, even though certain events in the future may have the effect of relieving him altogether of liability. See, in this connection, Massell v. Prudential Ins. Co., 57 Ga.App. 460, 196 S.E. 115."

A contingent liability is, therefore, not absolute, and until it becomes absolute, it cannot become current.

In Commissioner of Internal Revenue v. Keller, 7 Cir., 59 F.2d 499, 501, the word "current" is defined as follows: "The word 'current', when used as an adjective, has many and diverse meanings, and its definition depends largely upon the word which it modifies or the subject-matter with which it is associated. When applied to liabilities or bills of account, we think it conveys the idea of time, and refers to the present time or the present passing period; and yet when used in that sense the limitation as to time is not always the same, but is rather controlled by law or by the custom established in relation to the subject-matter then under discussion. We speak generally of current bills, and in most instances we thereby refer to the bills of account which are to be paid during the month; because in ordinary affairs most accounts, other than capital accounts, which are occasioned by the operation of one's business and in the care of one's self and family, are expected to be presented and paid within the month. The expression 'current taxes' is indeed a very common one, and unquestionably refers to taxes due or assessed within the present year, because the law requires taxes to be assessed and paid but once each year; a current bank account is one that is subject to present checking; a current periodical refers to one which is published during the present period, whatever that period may be."

All that has been said hereinabove is equally applicable to the situation presented by the guarantee of the taxpayer of the undertakings of its affiliate, the Beaumont Company, except it might be said that the Beaumont Company stands between the taxpayer and C. I. T., thereby rendering the accrual of any liability to the taxpayer even more remote than the alleged liability of the taxpayer under its own agreement for the discounting of its paper. In the event the Beaumont Company should fail to repurchase its discounted and defaulted paper from C. I. T., the taxpayer corporation would be re-

quired so to do under its contract of guarantee, but in that event the taxpayer would be subrogated to all rights of the Beaumont Company, and in that manner would succeed to the rights of the Beaumont Company in the reacquisition of the assets so repurchased. The taxpayer's liability in connection with the Beaumont Company's undertaking is identical with its own except that it is even more remote than its own, since the Beaumont Company must also default in addition to the default of the maker of the paper before the taxpayer can be called on its guarantee.

We hold, therefore, that the taxpayer has failed to bring itself within the provisions of Section 26(c) (2), and furthermore that its contract with C. I. T. whereby it may or may not be required to repurchase an asset, standing alone, creates no current liability until a default has occurred in the payments by the maker of the retained title contracts.

The decision of the Board of Tax Appeals is affirmed in both cases. Pursuant to the stipulation of the parties, Case No. 10491, although affirmed, is remanded to the Tax Court with directions that the Court "determine the deficit credits, if any, allowable to the petitioner for the fiscal year 1937 under Section 501 of the Revenue Act of 1942 [26 U.S.C.A. Int.Rev. Acts]."

SIBLEY, Circuit Judge (dissenting).

The case turns on the construction of a contract between the Warren Company and Trust Company of Georgia, trustee. The Secretary and Treasurer of the former and the trust officer of the latter, who have had the administration of the contract in hand, both testify that it includes among current liabilities of the Warren Company the contingent liabilities on transferred paper, that they considered its application to dividends in the tax years, and because of it no dividends were declared. The Board of Tax Appeals and this Court, by a labored construction, decide otherwise. It is remarkable that strangers should know better what a contract was intended to mean than do the parties to it.

It is suggested that such a contract could delay distribution of profits indefinitely by not paying a single bond. I do not think so. When the bonds fall due a profit-earning concern would have to pay them, and if it did not, the contract could not longer

be used to shield it from this tax. But if it were otherwise, no matter how long the contract not to pay dividends may run, Congress has said it is to protect against this special tax. In this case the suggestion of abuse is most inapt. It appears that in the tax year 1937 there were $105,-000.00 of bonds unpaid; in the tax year 1938, only $26,000.00. $79,000.00 of bonds had been paid in one year. It also appears that the last bond fell due in 1940. It was doubtless paid, and the distributable profits then distributed. We judicially know that the dividends in 1940 were taxed to the shareholders at a higher rate than if they had been distributed .in 1937 and 1938. The Government taxed all the profits in 1937 and 1938 as income of the Warren Company. These profits have been taxed again as dividends at high rates. There is no occasion to be astute to sharpen the fiscal knife to cut out a third and larger slice because they were not distributed a little sooner.

The construction given the words in the contract which define "current liabilities" as "accounts payable; trade acceptances; bills current and notes current, and any other liabilities other than these bonds", seems to me very unnatural. The definition says very plainly that all liabilities are included except the bonds. But if you take it to pieces, it amounts only to a proper definition of what "current liabilities" really are. A liability, in the vocabulary of accounting, is anything which you will or may have to pay. If you will certainly have to pay it, it is an absolute liability. If you may or may not have to pay it, it is contingent. Thus as respects the quality of certainty, all liabilities are divided into absolute and contingent liabilities. From another standpoint all liabilities are divided into "current" and "fixed" liabilities. Current means literally "running", "flowing". Current liabilities are those which are in the run or flow of the business, changing as business is done. Fixed liabilities are those which do not so change. Bonds and plant mortgages are fixed liabilities. All others, arising out of the business done, are current liabilities, just as this contract says.

That a liability is contingent has no bearing on whether it is current or not. The classification as current has nothing to do with the classification as contingent. The liability before loss on every insurance policy is a contingent liability but it is a current liability. The guaranty of a friend's conduct or account outside of the course of your business would be a contingent liability, but if running over a long period it might be a fixed rather than a current liability. The Warren Company had no fixed liability except these bonds. All its other liabilities, whether absolute or contingent, were current liabilities, by definition and in fact.

Were the obligations with respect to the transferred notes for its goods, which in the flow or current of its business it regularly discounts with C. I. T., current liabilities? Undoubtedly. Cochran v. United States, 157 U.S. 286, 296, 15 S.Ct. 628, 39 L.Ed. 704. They were all indorsed. The payment of each was expressly warranted, in addition to the specific agreement to take it up on tender if not paid. The Warren Company's liability was precisely that of an indorser of negotiable paper. The liability was contingent, of course, but it was current.

In balancing the assets, which also are divided into current and fixed, against the current liabilities, it is true, as the Court points out, that the liability to pay these transferred notes carries with it the reacquisition of the value of the notes and their security, and this contingent increase of current assets must be considered in deciding whether a dividend could be declared. The Board' did not find what this increase would be. The entire evidence before it is not in this record. It appears that the Warren Company kept a detailed record of the. transferred notes and the C. I. T. reported collections from time to time. Uncollected balances would be considered good unless it appeared otherwise. There is thus no impossibility of ascertaining anything that is necessary. The Board should find the facts as to offsetting contingent assets if necessary. But since current assets must be *twice* current liabilities in order to declare dividends, and since these off-setting assets could never more than equal the contingent liabilities, I think the Board was correct in saying that in each tax year no dividends could have been declared if the contingent liabilities were current liabilities. But the Board was wrong on the controlling question of construing the contract. The case should be sent back to it to reexamine the facts, if need be, as to the balance between current assets, absolute and contingent, and current liabilities, absolute and contingent.