**W. S. BADCOCK CORPORATION,**
Petitioner-Appellant,

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

No. 73-1948.

United States Court of Appeals,
Fifth Circuit.
March 29, 1974.

28. Id., 90, 91.

29. Id., 119.

 

Sherwin P. Simmons, Harold W. Mullis, Jr., Tampa, Fla., for petitioner-appellant.

Scott P. Crampton, Asst. Atty. Gen., Tax Div., U. S. Dept. of Justice, Ernest J. Brown, Acting Chief, Appellate Sec., Tax Div., Lee H. Henkel, Jr., Chief Counsel, I. R. S., Lawrence B. Gibbs, Acting Chief, Chris J. Ray, Atty., Richard W. Perkins, Murray S. Horwitz, Elmer J. Kelsey, Attys., Tax Div., Dept. of Justice, Washington, D. C., for respondent-appellee.

Before WISDOM, AINSWORTH and GEE, Circuit Judges.

GEE, Circuit Judge:

Taxpayer appeals from a judgment of the United States Tax Court which found deficiencies in its income tax. W. S. Badcock Corp., 59 T.C. 272 (1972). Involved are returns for its tax years ending in 1964[1] and 1966–68, aggregate additional taxes exceeding seven hundred thousand dollars, and something of a threat to accrual basis tax reporting. Since the facts of the case are painstakingly and accurately detailed in the Tax Court's careful opinion, we will state only so much as is necessary for understanding our reversal.

For forty years taxpayer sold household furnishings in essentially the same manner through consignment dealers. These dealers received their primary compensation as percentage commissions based on authorized sales prices. Most sales were on credit. Consonant with its accrual basis, taxpayer reported the full sales price as income in the year of sale, despite the fact that portions might be finally collected in later tax years. Likewise, it claimed as deductions the full amount of sales commissions accrued in the year of sale although, since these were not paid over to the dealer until the taxpayer received the collections on which they were based, portions were not remitted until later years. The claimed deficiencies resulted from the

---

1. By reason of a carryback from the year ending June 30, 1967.

Commissioner's determination that the unpaid portions of these commissions were not deductible in the year of their accrual. He did so because he concluded that, since most of taxpayer's contracts with his dealers provided that these commissions were not "earned" until collected, all events [2] necessary to fixing petitioner's liability to pay them had not occurred in the year of sale, hence they were improperly accrued.

■ It was stipulated that, if the commissions were properly accruable in year of sale, taxpayer's method of accounting clearly reflected income [3] based on its accrual method of accounting. That the amount of the commissions was determinable with requisite accuracy was also agreed. The Commissioner insisted that, in addition to the "earned" terminology of the contracts, the commercial risk of non-collection of the sales price was a contingency defeating deductibility under the all events test. Early in the history of our tax scheme the courts decided that the risk of collection in a credit transaction was not a condition defeating fixed liability. See, Ohmer Register Co. v. Commissioner, 131 F.2d 682 (6th Cir. 1942), which found fixed but unpaid sales commissions to be accruable expense deductions.

To conclude differently would be to call in question the very basis of accrual-basis tax accounting,[4] and we emphatically decline to do so. While the Commissioner disallowed accrual of the unpaid commissions as expenses, he did not contest taxpayer's accrual of the uncollected income which was equally subject to the risk of non-collection. Thus, as counsel for the Commissioner conceded at argument, the Commissioner's position and the Tax Court's judgment result in an obvious mismatch of taxpayer's income and expense.

■ Though a basic accounting principle is thus violated and taxpayer's net income irrationally distorted, the Tax Court felt bound to such a result by the literal words of taxpayer's contract with his dealers. We are no more inclined than that court to revise a party's private undertakings in the name of some abstract symmetry, and were this phrase of the contract language all that was before us, we would perforce agree with the Tax Court. Believing, however, that a consideration of the four (or more) corners and total context of taxpayer's dealer contracts raises sufficient fair doubt of the contracts' meaning to permit us to consider other factors,[5] we conclude that the taxpayer's

2. The "all events" test, that before an expense becomes deductible all events which fix the amount of taxpayer's liability must have come about, was set out in United States v. Anderson, 269 U.S. 422, 46 S.Ct. 131, 70 L.Ed. 347 (1926), and is codified in regulations promulgated under §§ 446 and 461, I.R.C. See § 1.446–1(c)(1)(ii) and § 1.461–1(a)(2), Treasury Regulations on Income Tax (1954 Code).

3. Within the meaning of §§ 446 and 461, I.R.C.

4. See also, Central Cuba Sugar Co. v. Commissioner, 198 F.2d 214 (2d Cir. 1952) [deductibility of broker's commissions]; Warren Co., Inc., 46 B.T.A. 897, aff'd 135 F.2d 679 (5th Cir. 1943), reh. den. 136 F.2d 685 (5th Cir.) [sales commissions]; Air-Way Electric Appliance Corporation v. Guitteau, 123 F.2d 20 (6th Cir. 1941) [sales commissions]; Holland, Accrual Problems and Tax Accounting, 48 Mich.L.Rev. 149 (1949); Revenue Ruling 72–34, 1972–1 C.B. 132 and G.C.M. 9571, X–2 C.B. 153.

As the Holland article states:
"If the collection of an item is uncertain only because of the normal risk involved in all business transactions, accrual is required. If such possibility of non-payment were to be accepted as a sufficient reason for not recognizing an item of income, the whole theory of the accrual method of accounting would fall where commercial transactions are concerned. This seems so obvious that it is surprising the courts have found it necessary to state it on several occasions. . . ." 48 Mich.L.Rev., at 173.
We labor the point slightly since the Tax Court opinion shows some tendency to treat normal default as an accrual-defeating contingency.

5. As would the Florida courts in determining the obligations of the parties and the effect of their agreements where ". . . the terms of a written contract are in any respect uncertain or doubtful and the parties thereto have by their conduct placed a con-

liability to pay the commissions was sufficiently fixed for deduction in the year it accrued them, though the time of their payment was deferred. As noted, the question turns wholly upon the construction to be accorded the commission arrangements provided by the dealers' contracts, and to that we now turn.

During the tax years in question, four types of dealer contracts were in use and taxpayer treated each in the same manner regardless of the presence in some and the absence in others of the "earned" wording urged as crucial here. The great majority of these provided, in pertinent part, as follows:

> That for all merchandise consigned by the Owner to the Dealer and sold by the Dealer, the Owner will pay, on or before the 10th day of each month, a commission of 25% of the authorized selling price and finance charges, such payments to be made as the money is collected by the Dealer, with the understanding, however, that *no commission is earned or due unless and until payments are collected by the Dealer and remitted to the Owner.* In the event the Dealer should discount either the authorized selling price or finance charges, the commission due the Dealer shall be reduced by the amount of such discount. (emphasis added)

Next in number were agreements providing as to sales commissions:

> That you will pay me (except as herein otherwise provided) on or before the tenth day of each month a commission of twenty-five (25%) per cent of the authorized selling price, as the money is collected by me. It being understood that *no commissions will be earned is due me [sic] unless payments are collected by me, said commission becoming due for payment to me only after the monies created by the sale thereof are collected by me and received by you.* (emphasis added)

One contract provided:

> I am to get 25% on time sales made at list time prices when you finance the contracts, *my part or profit payable only as the money is collected by me* or my employees and 15% on cash sales made at your list cash prices. (emphasis added)

Several contracts were oral. One other dealer's contract in evidence, though not effective during the years in question here, further illustrates the parties' overt verbal confusion about their commission arrangements:

> That you will pay us (except as herein otherwise provided) on or before the tenth day of each month a commission . . . as the money is collected by us. It being understood that no commissions will be earned is due us [sic] unless payments are collected by us, said commission becoming due for payment to us only after the monies created by the sale thereof are collected by us and received by you.

In varying degrees, each of the above excerpts is on its face at worst ambiguous about the parties' intent whether the commissions are deemed *earned* by the mere act of sale, but *payable* only out of monies as collected, or whether some contingency other than collection is applicable to the commissions as income to the dealer but not to the balance as income to the taxpayer. Indeed, the next-to-last excerpt quoted above is plain that there is no other contingency. Neither party invites us to treat each formulation contract by contract, on the basis of its own particular language. Both the Commissioner and the taxpayer treat them all as what they rather plainly are: examples of a layman's developing verbiage seeking to express a single and unvarying meaning, embodied in various contracts of adhesion. It is to be whole hog or nothing. So seen, we conclude that even conflicts between the contracts

struction upon the contract which is reasonable. . . ." Orlando Orange Groves Co. v. Hale, 119 Fla. 159, 161 So. 284, 295 (1935).

—which were applied, it should be borne in mind, identically by the taxpayer— suffice to render each ambiguous on its face. We therefore look to that most reliable indicator of what the contracting parties meant: what they did.

When we do so, our doubts about the parties' intentions whether the commissions were deemed earned at time of sale are quickly and emphatically resolved. The facts, which are stipulated and not in dispute, reveal a consistent course of dealings between taxpayer and his dealers, long-maintained and utterly refuting the notion that the parties did not consider the commissions property of the dealers at time of sale. It is shown, for example, that the dealers were accustomed to borrow substantial amounts from banks, third persons and, most significantly, from the taxpayer itself upon the collateral of the accrued but unpaid sales commissions. Almost six hundred thousand dollars in borrowed funds were so secured in the years in question. Retainages in significant amounts were made by dealers, both with and without taxpayer's prior knowledge, for business and personal financial purposes from collections before their deposit with taxpayer. Some of these represented advance payments on sales commissions; no interest was charged by taxpayer on these. An additional commission was paid for services in collecting receivables, including delinquencies and repossessions, a practice which refutes the notion that the sales commissions here in question were on condition of future services in making collections. Finally, upon sale of a dealership, either directly to taxpayer or in a taxpayer-sponsored transaction with a third party, the dealer received the full amount of his accrued commissions,[6] despite existing un-

collected sales proceeds, upon which the commissions were based. That these practices were well established and understood was attested by the fact that in over forty years of operations under them taxpayer was never sued by a dealer over commissions. And while there is no question of any estoppel or binding effect on the Commissioner, it cannot be entirely without significance that in ten audits over the course of forty years, the Revenue Service never raised any objection to taxpayer's treatment of these commissions as deductions and, in connection with one of the years here in dispute, specifically approved it as necessary " . . . for a proper matching of income and expense which would clearly reflect income as required by the Internal Revenue Code."

It is undisputed also that these contracts were drafted, without tax consequences in mind, by a layman, Wogan S. Badcock.[7] And while we are constrained to admit the obvious, that his gifts as a furniture merchant far exceed those as a scrivener, yet his consistent actions and those of his dealers speak louder of their intent than his somewhat confusing words. In sum, to speak in the context of accrual-basis accounting of items which are subject to no contingency except the normal, commercial risk of collection as unearned is almost meaningless. The contract terms are confusing, and the consistent practice of forty years belies any intent to attach a meaning to the term "earned" other than that of "due" or "payable." We are often and rightly besought by the Commissioner to look to the substance rather than the form of transactions. Doing so here, we conclude that the decision of the Tax Court must be

Reversed.[8]

---

6. Appropriately discounted for bad-debt experience.

7. It is in evidence that dealers sometimes objected specifically to the "earned" terminology, and were pacified by taxpayer's assurance that there had never been any litigation about it. We attribute his insistence on this language despite these objections, however, to a layman's determination to make plain that no commissions would be paid until the proceeds on which they were based were collected.

8. Including, of course, its affirmance of the Commissioner's action in changing taxpayer's method of accounting to a cash basis for dealer commissions and an accrual basis for all other expenses and for income.