T.C. Memo. 2000-244


UNITED STATES TAX COURT


NEWHOUSE BROADCASTING CORPORATION AND
SUBSIDIARIES, ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos.   19448-97, 23753-97,          Filed August 7, 2000.
              24489-97, 6210-98.


        P and R have both moved for partial summary
    judgment on the issue of whether royalties payable by
    an accrual basis publisher to authors based upon book
    sales, less actual returns, are fully deductible in the

_____

    [1]  Cases of the following petitioners have been consolidated
herewith:  Advance Publications, Inc. and Subsidiaries, docket
No. 23753-97; Cox Enterprises, Inc., and Subsidiaries, docket No.
24489-97; and Chronicle Publishing Co., Richard T. Thieriot, Tax
Matters Person, docket No. 6210-98.  Such consolidation was made
because of a common issue of eligibility for transition
investment tax credit under cable television franchise
agreements.  That issue was addressed on motions for partial
summary judgment in docket No. 19448-97.  Petitioner in this case
is petitioner in docket No. 23753-97, and the issue involved is
unique to that petitioner.

year of the sales or whether the deduction must be reduced to the extent that payment of the royalties is withheld as "a reasonable reserve for returns".
        Held: The royalties are fully deductible in the year of sale.


Bernard J. Long, David E. Mills, and James R. Saxenian, for petitioner.

Gary D. Kallevang and William J. Gregg, for respondent.


MEMORANDUM OPINION

HALPERN, Judge:  Both petitioner Advance Publications Inc. (petitioner) and respondent have moved for partial summary judgment.  Each party objects to the other's motion.  The issue common to those motions (petitioner's motion, respondent's motion or, together, the motions) is whether petitioner's deduction for royalties owed to book authors under agreements between its publisher subsidiaries and the authors was properly computed for petitioner's 1989 and 1990 taxable (calendar) years (the audit years) by not taking into account a reduction in the royalty payments to authors for "a reasonable reserve for returns".

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## I. Background

For purposes of the motions, the parties have stipulated certain facts. We accept the stipulated facts as being true for purposes of deciding the motions. The stipulation of facts, with attached documents, is incorporated herein by this reference. The parties have also filed various memoranda of law, some with attached affidavits, and other documents. The following recitation of facts is drawn primarily from the stipulation of facts. Certain other facts (which facts we deem noncontroversial) are included in that recitation.

Petitioner is a New York corporation with its principal office in Staten Island, New York. Petitioner, an accrual basis taxpayer, engaged in the book publishing business during the audit years through its then wholly owned subsidiary, Random House, Inc. (Random House), and Random House's subsidiaries.[2] During the audit years, Random House, through its divisions and subsidiaries, published books under several trade names, known as "imprints" in the publishing business. Random House's major imprints included Random House ("Random House Adult Trade Imprint"), Alfred A. Knopf, and Ballantine Books, which accounted for more than 50 percent of its book sales revenue during the

---

[2] Random House was sold to an unrelated third party on July 1, 1998.

audit years. Approximately 10 additional imprints accounted for the remainder of its book sales.

During the audit years, Random House's publishing business consisted of the following primary activities: acquisition of rights to manuscripts, editing manuscripts, contracting for the manufacture of books, and marketing and selling books. Random House primarily sold books to individual bookstores, book wholesalers, book retail chains, mass marketers, and book clubs (customers). Random House customers sold books purchased from Random House and other publishers to the general public (consumers). Under the terms of its sales agreements with customers, the customers had the right, under certain circumstances, to return books for full credit.

Random House and its subsidiaries entered into written contracts with each Random House author or licensor (author contracts). The principal terms covered by an author contract included delivery timetables for the manuscripts, royalty rates, and payment terms. The Random House Adult Trade and Alfred A. Knopf (Knopf) imprints used one standard form of author contract and the Ballantine Books division (Ballantine) used another. Over 99 percent of all executed author contracts utilized such standard contracts. Under the terms of all author contracts, authors generally earned royalties as a percentage of the publisher's invoice price on copies of books sold by the publisher. The

"invoice price" was defined in each author contract as "the price shown on the Publisher's invoices to its wholesaler and retailer customers from which the Publisher's wholesaler and retailer discounts are calculated."

The Ballantine standard author contract provides that "[t]he Publisher agrees to pay the Author a royalty on the retail price or, for any hardcover copies, on the invoice price of each copy of the Work sold by Publisher, less returns".  A separate paragraph of the contract requires Publisher to "render semi-annual accountings * * * on or before February 1st for the six-month accounting period ending in the preceding September and on or before August 1st for the six-month accounting period ending the preceding March."  This paragraph further provides that "[e]ach statement rendered will be accompanied by payment of the amount shown to be due thereon, after allowance of a reasonable reserve for returns and after recoupment of [advances]."

Both the Random House and Knopf standard author contracts provide that "[t]he Publisher shall pay to the Author a royalty on the invoice price of every copy sold by the Publisher, less actual returns and a reasonable reserve for returns".[3]  The Random House and Knopf standard author contracts, like the Ballantine form of

_____

[3]  A few contracts in effect during the audit years, in a format different from the contracts discussed above, provided for the withholding of a royalty reserve against future returns only during the first 2 years following publication.

contract, also require semiannual accountings and royalty payments; and the procedures followed with respect to royalties payable under all three forms of author contract are identical. Thus, along with the royalty check for the 6-month royalty period, Random House typically issued a royalty statement to the author covering such period. Each statement contains a column entitled "earnings" and a subsequent column entitled "charges". The former shows cumulative earnings to date based upon total books sold less total books actually returned through the beginning of the statement period. Where the prior withholding based upon the "reasonable reserve for returns" was in excess of the amount justified by the actual returns for the prior period, the earnings column also includes an amount for "refund of reserves" (refund of reserves). Thus, for each 6-month royalty period, the prior estimated reserve is adjusted to reflect actual experience. The "charges" column includes an amount representing actual returns for the period and an amount for the "current reserve for returns". These charges are an offset to any royalty based on sales that might otherwise be due for the period.

Random House was contractually required to, and did, pay royalties with respect to books that were sold and not returned, even though Random House never received payment for the books and wrote off the debt as uncollectible (e.g., because of the customer's bankruptcy). The royalty payable upon the sale of a

book was reversible only in the event of a subsequent return of the book by the customer.

In computing Random House's income each year for financial statement purposes, petitioner took into account the revenue attributable to books sold to customers during the year, less the revenue attributable to books actually returned by customers during such year. This amount was adjusted by the difference between the "reserve for returns" (reserve for returns) at the beginning and at the end of the year; i.e., an increase in the reserve for returns would be subtracted from sales. The reserve for returns adjustment represented the revenues attributable to books sold during a particular year that Random House estimated would be returned during the subsequent year. These factors resulted in the figure "net sales" appearing on the financial statements.

The financial statements also took into account, as an expense each year, royalties payable on book sales, less books actually returned by customers, during such year. This amount was adjusted by the difference between the "royalty reserve" (royalty reserve) at the beginning and at the end of the year; i.e., an increase in the royalty reserve would be subtracted from the amount of the royalty expense. The royalty reserve adjustment represented the royalties attributable to the books sold during a particular year that Random House estimated would be returned

during the subsequent year.  Therefore, for financial statement purposes, each year's royalty expense reflected a reduction for royalties attributable to the estimated subsequent year's returns.

According to Random House's books, the beginning and end of year balances of the reserve for returns for the audit years were as follows:

|  | 1989 | 1990 |
|---|---|---|
| Balance in reserve for returns beginning of year | $63,652,154 | $93,923,107 |
| Balance in reserve for returns end of year | 93,923,107 | 96,957,702 |
| Net increase to reserve for returns | 30,270,953 | 3,034,595 |

According to Random House's books, the beginning and end of year balances of the royalty reserve for the audit years were as follows:

|  | 1989 | 1990 |
|---|---|---|
| Balance in royalty reserve beginning of year | $7,327,000 | $9,230,000 |
| Balance in royalty reserve end of year | 9,230,000 | 10,278,077 |
| Net increase to royalty reserve | 1,903,000 | 1,048,077 |

For tax purposes, Random House reversed those financial statement reserve adjustments.  Accordingly, to arrive at net sales for income tax purposes, Random House increased financial statement net sales by $30,270,953 for 1989 and $3,034,595 for

1990, and, to arrive at royalty expense for income tax purposes, Random House increased financial statement royalty expense by $1,903,000 for 1989, and $1,048,077 for 1990.[4] Respondent disputes only the latter adjustment to Random House's financial statement income.

The parties disagree on whether the annual adjustments to the royalty reserve for financial statement purposes were the same as the annual amounts withheld from the royalties paid to authors as a "reasonable reserve for returns" (reasonable reserve for returns). Petitioner alleges that the financial statement reserve for returns and royalty reserve were determined on a completely different basis than the reasonable reserve for returns withheld from the royalty payments to authors. The former were Generally Accepted Accounting Principles (GAAP) reserves whereas the latter was determined on an author-by-author basis as a cash management device, and was intended to protect Random House against the possibility of a payment of royalties to an author in one accounting period and the company's subsequent inability to recover royalties from that author (based upon returns) in a later accounting period. According to petitioner, the amount of royalties actually withheld from authors is not known,

---

[4] In determining taxable income and deductible royalty expense attributable to the sale of soft cover books, Random House did take into account subsequent year returns to the extent permitted by sec. 458.

individually or in the aggregate, because petitioner saw no need
to keep a record of such amounts.  In petitioner's view, they were
irrelevant for both financial and tax reporting purposes.
Petitioner, therefore, concludes that respondent's proposed
reversal of petitioner's royalty expense deductions, by focusing
on the financial statement royalty reserve, necessarily focuses on
an incorrect amount.

Respondent responds that the alleged difference between the
financial statement royalty reserve and the amounts actually
withheld from authors "cannot be readily corroborated one way or
the other",[5] and that petitioner has not "adduced any specifics to
establish the extent to which * * * [the two amounts] may have
differed".  Respondent also argues that "[u]nless * * *
[petitioner] wishes to admit that its financial statements are
grossly unreliable, [petitioner's] adjustments to the royalty
reserves should be considered reasonably accurate as to the
overall expense deduction at issue."  It is apparently on that
basis, and on the basis that respondent views any difference
between the two amounts as "irrelevant to the resolution of the
legal issue", that respondent justifies his proposed increase in
petitioner's income for the audit years by the amount of the

---

[5] Petitioner's position is based upon affidavits filed by
the former general counsel and the former chief financial officer
of Random House.

increase in the financial statement royalty reserve for such years.

## II. Summary Judgment

A summary judgment is appropriate "if the pleadings, answers to interrogatories, depositions, admissions, and any other acceptable materials, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law." Rule 121(b). "A partial summary adjudication may be made which does not dispose of all the issues in the case." Id. Summary judgment is a device used to expedite litigation and is intended to avoid unnecessary and expensive trials of phantom factual questions. See, e.g., Espinoza v. Commissioner, 78 T.C. 412, 415-416 (1982). It is not, however, a substitute for a trial in that disputes over factual issues are not to be resolved in such proceedings. See id. The party moving for summary judgment has the burden of showing the absence of a genuine issue as to any material fact. See id.

## III. Discussion

### A. Arguments of the Parties

Respondent argues that, because the author contracts provide that Random House is liable to pay a royalty amount that subtracts a reasonable reserve for returns, Random House does not owe its authors the amount of the reasonable reserve for returns. Because petitioner does not owe this amount, and because it does not

anticipate that a royalty will be paid for such amount, petitioner fails to satisfy the section 461 "all events test" with respect to the reserve amount as of the end of the taxable year. Therefore, its annual tax accrual for royalty expense must be reduced by such amount. Respondent agrees that a book reserve based upon GAAP principles is not normally taken into account for tax purposes, but where, as in this case, the contracts establishing the taxpayer's liability specifically reduce that liability by the amount of the reserve, it is the contract terms and not GAAP principles that require the same reduction in liability for tax purposes. Respondent summarizes his position as follows:

> Quite simply, an accrual taxpayer cannot accrue as an expense what it does not legally owe, and petitioner does not owe payment for the "reasonable reserve for returns" that is to be subtracted from the royalty payment when payment is made.

Petitioner counters that "the logical and plain reading" of those portions of the author contracts that pertain to author royalties is that Random House and its subsidiaries owe royalties for all books sold and not actually returned by the end of each 6-month royalty accounting period, but that the obligation to pay a portion of these royalties is deferred to a later period as security against the possibility of future returns. Petitioner argues that respondent erroneously treats that reduction in the amount of royalties payable to authors as a reduction in the amount of royalties owed to the authors as of the end of the

taxable year. Petitioner further argues that withholding payment of a liability accrued in one taxable year pending the outcome or occurrence of an event in a subsequent taxable year does not reduce the accrual by the amount of the withheld payment. Petitioner concludes that, because a delay in the payment of an accrued liability does not delay its deductibility by an accrual basis taxpayer, petitioner's deduction for royalties owed to its authors may not be reduced by the amounts withheld as a reasonable reserve for returns.

Petitioner additionally argues that, because respondent's determination of deficiency is based upon the yearend financial statement royalty reserve rather than upon the royalties that were actually withheld from authors, it is "arbitrary and erroneous and cannot be sustained".[6]

B.  Analysis

1.  Proper Royalty Accrual

In general, a liability may be taken into account for Federal income tax purposes by an accrual method taxpayer in the taxable year in which all the events have occurred that establish the fact

---

[6]  A finding that a determination of deficiency is arbitrary and without foundation would not, in and of itself, require that we grant petitioner's motion for summary judgment.  Rather, we would be constrained to deny respondent's motion for summary judgment and require respondent to sustain what then would be respondent's burden of going forward with evidence to show the correctness of the deficiency determination.  See Helvering v. Taylor, 293 U.S. 507 (1935); Shriver v. Commissioner, 85 T.C. 1, 3 (1985); Franklin v. Commissioner, T.C. Memo. 1993-184.

of the liability, the liability can be determined with reasonable accuracy, and economic performance has occurred with respect to the liability. See sec. 1.461-1(a)(2), Income Tax Regs. The first two requirements comprise the "all events test" for accrual of a liability. See sec. 461(h)(4). The parties are in agreement that the amount of petitioner's liability for royalty expense can be determined with reasonable accuracy. Respondent also acknowledges that economic performance has occurred. See sec. 461(h)(2)(A)(iii); secs. 1.461-4(d)(3)(ii) and 1.461-4(d)(7) Example (9), Income Tax Regs., which provide, in effect, that economic performance with respect to a royalty based upon sales during the taxable year, arising from the use of property, occurs as the sales occur during such taxable year. We are, therefore, left to decide whether all of the events had occurred as of the end of each of the audit years that established petitioner's liability for royalties attributable to book sales for those years, including amounts representing royalties that had been withheld from the authors as "a reasonable reserve for returns".

       a.  <u>The Author Contracts</u>

The three forms of author contract (the contracts) are ambiguous with respect to the royalties due the author at yearend because the contracts discuss authors' royalties solely in terms of the amount payable at the royalty payment dates rather than in terms of the amount owed. Thus, under the contracts, the

publisher (either Random House, Knopf, or Ballantine, hereafter generally referred to as Random House) agrees to pay the author a royalty based upon sales less "actual returns" and less "a reasonable reserve for [future] returns".  The contracts require semiannual royalty payments and accompanying "statements of account" or "accountings".  An examination of the manner in which the semiannual royalty payments were determined pursuant to the contemporaneous statements of account reveals, however, that the royalties owed by Random House to its authors at any given point in time were, as urged by petitioner, based upon book sales less actual returns.

As noted above, the royalty statements of account furnished by Random House itemize the royalties due the author on the basis of total books sold less total books actually returned through the beginning of the statement period.  In addition, an adjustment is made for the excess, if any, of the prior period withholding of royalties based upon the reasonable reserve for returns over the royalty reduction justified by actual returns during the statement period, i.e., the statement reflects an additional amount for refund of reserves, and such amount is included in the royalty payment for the statement period.  The balance of the payment for the statement period is based upon sales of books less actual returns for such period, and less the current reasonable reserve for returns.

"Generally speaking, the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence."  Old Colony Trust Co. v. City of Omaha, 230 U.S. 100, 118 (1913).  That principle has been applied in tax controversies involving one of the parties to the contract.  See W.S. Badcock Corp. v. Commissioner, 491 F.2d 1226, 1230 (5th Cir. 1974), revg. 59 T.C. 272 (1972)[7]:  "We * * * look to that most reliable indicator of what the contracting parties meant:  what they did."  See also Diehl v. Commissioner, 1 T.C. 139, 144 (1942), affd. 142 F.2d 449 (6th Cir. 1944), and Connally v. Commissioner, T.C. Memo. 1961-312, both of which cite with approval the admonition of the Supreme Court in Insurance Co. v. Dutcher, 95 U.S. 269, 273 (1877):  "There is no surer way to find out what the parties meant, than to see what they have done."

---

[7]  We note that the reversals of this Court in W.S. Badcock Corp. v. Commissioner, 491 F.2d 1226 (6th Cir. 1974), revg. 59 T.C. 272 (1972), and in two cases cited infra, Ohmer Register Co. v. Commissioner, 131 F.2d 682 (6th Cir. 1942), revg. a Memorandum Opinion of this Court, and Central Cuba Sugar Co. v. Commissioner, 198 F.2d 214 (2d Cir. 1952), affg. in part and revg. in part 16 T.C. 882 (1951), were not based upon any disagreement by this Court with the legal principles for which those cases are cited herein.  Rather, the reversals were based upon the appellate courts' rejection of our factual finding, in each case, that the employees had not earned, and the taxpayer did not owe, any sales commissions until a year subsequent to the year of sale; i.e., there was disagreement whether the payment contingency was a condition precedent or a condition subsequent to a fixed commission obligation.  See the discussion of this distinction, infra.

Ultimately, the authors were entitled to be paid (and, in fact, were paid) royalties on all books that were sold and not actually returned, including unreturned books for which payment was never received by Random House. Therefore, based upon the parties' conduct under the contracts, we find that the withholding of royalties representing a reasonable reserve for returns constituted a delay in the payment of royalties otherwise due the authors for each statement period in anticipation of actual returns during the subsequent statement period.

### b. Discussion of Authorities

We agree with petitioner that this case is governed by the rule of law which states that the deduction of a liability that otherwise satisfies the all events test is not negated by the taxpayer's right to defer payment of the liability pending the occurrence (or nonoccurrence) of some event after the close of the taxable year. See Lawyers' Title Guar. Fund v. United States, 508 F.2d 1, 6 (5th Cir. 1975); W.S. Badcock Corp. v. Commissioner, supra; Ohmer Register Co. v. Commissioner, 131 F.2d 682, 686 (6th Cir. 1942), revg. a Memorandum Opinion of this Court; Central Cuba Sugar Co. v. Commissioner, 198 F.2d 214, 217-218 (2d Cir. 1952), affg. in part and revg. in part 16 T.C. 882 (1951); Warren Co. v. Commissioner, 46 B.T.A. 897, 913-914 (1942), affd. 135 F.2d 679, rehearing denied 136 F.2d 685 (5th Cir. 1943). As stated by the Court of Appeals for the Fifth Circuit in Lawyers' Title Guar.

Fund v. United States, supra at 6: "'The all events test' is recognized but regarded as not failed merely because a 'condition subsequent' may interfere with actual payment"; see also Central Cuba Sugar Co. v. Commissioner, supra. In the cases cited, the taxpayer was obligated to pay a fixed commission based upon sales that had occurred by the end of the taxable year, although actual payment of the commission was predicated upon events transpiring after the close of the taxable year. For example, in Ohmer Register Co. v. Commissioner, supra at 683, as in this case, where the royalties to authors were reduced to take account of returns, a commission credited to a sales agent on the original sale would be reversed should the company be required to "take back the product sold", i.e., should the product be returned. In Ohmer Register Co., as in the other cited cases, the taxpayer was allowed to deduct commissions due with respect to sales in the year of the sales, rather than in the subsequent year when the obligation to actually pay the commissions was discharged. The court noted that "[t]he fact that the agent might not, in the end [,] receive his full commission is no more material than that the petitioner might not receive full payment of the purchase price of the article sold." Id. at 686.

In Helvering v. Russian Fin. & Constr. Corp., 77 F.2d 324, 327 (2d Cir. 1935), affirming a Memorandum Opinion of this Court, the Court of Appeals for the Second Circuit stated the applicable

rule as follows: "That the liability may not subsequently be discharged by payment does not necessarily prevent its consideration as a liability for the years accrued. * * * The existence of an absolute liability is necessary; absolute certainty that it will be discharged by payment is not." See also United States v. Hughes Properties, Inc., 476 U.S. 593, 606 (1986).

The cases upon which respondent places principal reliance (United States v. General Dynamics Corp., 481 U.S. 239 (1987); ABKCO Indus., Inc., v. Commissioner, 56 T.C. 1083 (1971), affd. 482 F.2d 150 (3d Cir. 1973); Field Enters., Inc. v. United States, 172 Ct. Cl. 77, 348 F.2d 485 (1965)) are inapposite. In each of these cases the Court found that the taxpayer's liability for the payments in question (in General Dynamics Corp, claims for medical benefits; in ABKCO Indus., royalties; and in Field Enters., Inc., "quality bonuses") was contingent upon the prior occurrence of a particular event (a condition precedent). In this case, all of the events that fixed the author's right to royalties had occurred by the end of the taxable year (i.e., the completed sales of books). That a portion of these royalties was withheld and might never be paid because of returns in a subsequent taxable year does not negate petitioner's right to accrue the royalty expense in the year of sale.

The parties also dispute whether respondent's position gives rise to an improper mismatching of income and expense. This dispute is largely beside the point in light of our conclusion that Random House's obligation to pay royalties to its authors in the year of sale, undiminished by the amounts withheld as "a reasonable reserve for returns", constituted a proper accrual under the all events test. Where, as here, both the income and expense items relating to the same transaction meet the tax requirements for accrual, matching is appropriate and desirable. See Warren Co. v. Commissioner, 46 B.T.A. 897, 913-914 (1942), affd. 135 F.2d 679, rehearing denied 136 F.2d 685 (5th Cir. 1943).[8]

---

[8] An exception to the deduction of an expense that otherwise satisfies the all events test has been made under circumstances in which payment of the expense would have been delayed for such a substantial period that there was a violation of the clear reflection of income standard. See Mooney Aircraft, Inc. v. United States, 420 F.2d 400 (5th Cir. 1970) and Ford Motor Co. v. Commissioner, 102 T.C. 87 (1994), affd. 71 F.3d 209 (6th Cir. 1995); see also Exxon Mobil Corp. v. Commissioner, 114 T.C. 293, 323 (May 3, 2000). Also, exceptions to the principle that related income and expense items should be accrued in the same taxable year have been made where the tax law specifically requires, or permits, the acceleration, or deferral, of one, but not both, of these items. See, e.g., Marcor, Inc. v. Commissioner, 89 T.C. 181 (1987), where we allowed a current deduction for certain preparation and installation costs under circumstances in which the related fees for these services were considered part of the payments for merchandise, the reporting of which was deferred under the statutorily permitted installment method. No such exception to the normal rules of expense accrual or to the matching principle pertains to this case.

We hold that, for the audit years, petitioner was entitled to a deduction for royalties due with respect to books sold during the year, less returns, without reduction for royalty payments withheld from the authors during the year as "a reasonable reserve for returns."

### 2. Whether the Determination of Deficiency Was Arbitrary

Because of our holding that any reduction in petitioner's accrual deduction for royalties is improper, it is unnecessary to address petitioner's argument that the amount of respondent's proposed deficiency is "arbitrary and erroneous and cannot be sustained".

### C. Conclusion

Petitioner's motion for partial summary judgment shall be granted and respondent's motion for partial summary judgment shall be denied.

An appropriate order

will be issued.